UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CONAGRA BRANDS, INC., et al.,<br><br>Defendants. | Case No. 1:19-cv-01323<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>Judge Edmond E. Chang<br><br>DEMAND FOR JURY TRIAL |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff National Elevator Industry Pension Fund ("National Elevator" or "Lead Plaintiff"), Plaintiff City of Taylor Police and Fire Retirement System ("City of Taylor") and Plaintiff City of Sarasota Police Officers' Pension Plan ("City of Sarasota") (collectively referred to herein as, "Plaintiffs") allege the following upon knowledge as to their own acts and upon the investigation conducted by its counsel, which included, among other things, a review of: (a) public filings made by Conagra Brands, Inc. ("Conagra" or "the Company"), Pinnacle Foods, Inc. ("Pinnacle") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined herein), Pinnacle and other related non-parties; (c) securities analysts' reports, news articles, shareholder communications, conference calls and postings on Conagra's website concerning the Company's public statements; and (d) review of other publicly available information concerning Conagra, the Executive, Director and Underwriter Defendants (defined herein) (collectively referred to herein as, "Defendants") and Pinnacle. Lead Plaintiff and Plaintiffs City of Taylor and City of Sarasota believe substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a securities class action on behalf of Lead Plaintiff, Plaintiff City of Taylor, Plaintiff City of Sarasota and all purchasers of Conagra common stock from June 27, 2018 through December 19, 2018, inclusive (the "Class Period"), as well as those who acquired Conagra common stock traceable to the registration statement, prospectus and prospectus supplements incorporated therein (the "Offering Documents"), issued in connection with the Company's October 2018 Secondary Public Offering ("SPO"). This action asserts claims brought under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and certain violations of the

Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ("Rule 10b-5") promulgated thereunder.

2. Conagra is a packaged food company that sells products under various brand names that are available in supermarkets, restaurants and food service establishments. The Company has a portfolio of well-known brands that includes Slim Jim, Marie Callender's, Reddi Whip, Healthy Choice, Orville Redenbacher's and BOOMCHICKAPOP.

3. Pinnacle was a publicly traded food manufacturer, marketer and distributor with a stable of iconic brands, including Birds Eye, Duncan Hines and Wish-Bone. On June 27, 2018, after nearly two years of negotiations, Conagra announced a proposed merger with Pinnacle in a cash and stock transaction valued at approximately $10.9 billion (the "Transaction"). The merger transaction closed on or about October 26, 2018.

4. During the Class Period, Defendants misrepresented the state of Pinnacle's business and Conagra's ability to smoothly integrate Pinnacle. Defendants also failed to disclose a known change in trend in Pinnacle sales and that Pinnacle's sales were being materially impacted by channel stuffing via low Return on Investment ("ROI") promotional pricing that both cannibalized future period sales and eroded Pinnacle's gross margin.

5. Defendant Sean Connolly ("Connolly") became Conagra's Chief Executive Officer ("CEO") in April 2015. As CEO, Connolly embarked on a strategy to transform Conagra's brands (including those eventually acquired from Pinnacle) by breaking what Connolly described as "bad habits." Prior to the Pinnacle acquisition, Conagra was successful in ridding itself of these "bad habits," which according to Connolly, include:

- "***focus on volume***" (instead of "value creation")
- "***reliance on trade/push***" (aka, channel stuffing)
- "***undisciplined innovation***"

- "***low ROI A&P support***" (aka, low return advertisements and promotions).[1]

6. Breaking these "bad habits" meant Connolly could realize "premiumization" of Conagra's portfolio, whereby Conagra brands command higher prices and margins and engineered better rates for retailers thus incentivizing retailers to stock Conagra's full portfolio of brands.

7. In November 2017, Connolly told investors that Conagra was successfully breaking these bad habits and achieving premiumization: "***So we're getting higher pricing through modernized innovation, premiumizing our portfolio*** and not just playing it in some of our categories at the value tiers where we played historically."

8. While Connolly was "premiumizing" Conagra's portfolio in 2017, he was also targeting Pinnacle for acquisition. Connolly had carefully studied Pinnacle for years with a view towards acquiring and then "premiumizing" Pinnacle's leading brands, such as Birds Eye. He once signed a merger agreement with Pinnacle in 2014 when he was CEO of Hillshire Brands, Inc. Although that merger was not consummated, after Connolly became CEO of Conagra, he embarked on nearly two years of negotiations with Pinnacle, including a detailed review of industry data, Pinnacle's books and records, and Pinnacle's scanner data and promotional contracts as part of the merger due diligence process.

9. Through this investigative process, Defendants learned that Pinnacle's brands suffered from all the bad habits that interfered with premiumization, *e.g.*, that Pinnacle's brands ***lacked innovation***, organic sales were declining and that in order to conceal this declining trend in net sales, Pinnacle was ***favoring volume over value, stuffing its sales channel and utilizing low ROI promotions that negatively impacted gross margin***.

[1] All emphasis is added and citations omitted unless otherwise noted.

10. Indeed, a UBS analyst reported in January 2019 that Conagra management candidly revealed that Pinnacle's brands long suffered from "***lackluster innovation***" so "***PF needed to rely on trade to hit targets***." In fact, lackluster innovation required Pinnacle to execute poor ROI trade deals if it was going to meet its 2019 sales targets. According to UBS, this resulted in margin goals that "***had an unrealistic time frame***" and "***Pinnacle pricing [that] failed to come through***" resulting in a "***80-90 bps***" hit to Pinnacle's gross margin. Defendants were aware pre-merger that if they accepted Pinnacle's 2019 low-ROI trade deals post-merger, doing so would dilute Conagra's hard-earned brand premiumization. Shortly after the merger, Conagra predictably killed Pinnacle's planned low-ROI "bad habit."

11. In sum, Defendants' pre-merger investigations of Pinnacle revealed that Conagra's planned integration through premiumization of Pinnacle's brands meant both companies would have to bite the bullet to break Pinnacle's bad habits, further slowing Pinnacle's sales and hurting Conagra's combined results. Although these red flags were evident to Defendants during their extensive and lengthy pre-merger investigations of Pinnacle, Defendants could not disclose these red flags to Conagra investors without the risk of losing a Pinnacle merger (again), and without also jeopardizing the $600-plus million investment and any potential profits to be made by JANA Partners LLC ("JANA"), a major Conagra shareholder who in early 2018 acquired a 9.5% activist stake in Pinnacle in order to help Conagra acquire it.

12. Thus, instead of being truthful about Pinnacle's "bad habits," and the time and costs associated with fixing Pinnacle's bad habits further hurting Pinnacle's sales and margins, Connolly decided to protect at all costs the merger's prospects, and JANA's huge Pinnacle investment, by misleadingly telling Conagra investors on the first day of the Class Period that there were no known factors that would interrupt growth for "***both***" companies: "We expect ***top line growth to continue***

***at the pace both companies*** have delivered. . . . ***And with the addition of Pinnacle, we expect an improved margin profile and EPS accretion versus the Conagra base business***."

13. Defendants also misrepresented that: Pinnacle's "full year 2017 net sales were $3.1 billion" (representing year over year ("YOY") growth of $17 million), and that ***the merger with Pinnacle would not negatively impact "Organic Net Sales Growth," but would instead positively impact "Adj. Gross Margin."***

14. In addition, throughout the Class Period, Defendants continued to misrepresent the benefits of acquiring Pinnacle, describing the merger as "a no-brainer of a deal" that would combine "two ***growing*** portfolios of iconic brands" and that the Transaction would "accelerate [Conagra's] ability to generate value" as well as "capture compelling financial benefits," and that the Company would be able to "implement a smooth integration process," as it had been "very clear-eyed from the beginning."

15. On or about October 10, 2018, Defendants sold 16.3 million shares of Conagra common stock pursuant to the Offering Documents, raising $575 million to finance, in part, the pending merger with Pinnacle.

16. The Offering Documents for the SPO likewise misrepresented that Pinnacle had recorded an uninterrupted trend of YOY net sales growth from 2015-2017 and that Pinnacle net sales grew both in 2017 and for the first half of 2018.

17. All of the above statements were false and/or misleading as Pinnacle net sales began declining in 2017 and continued to decline in 2018. Furthermore, to conceal the declining trend in net sales, Pinnacle stuffed its sales channel by pushing product into distribution, favoring volume over value and offering unsustainable low ROI promotional discounts and other incentives that negatively impacted Pinnacle's gross margin and cannibalized future revenues.

18. In addition, Connolly's representations regarding sales, expected margin improvement and earnings per share ("EPS") accretion were false and/or misleading as a result of all of the "bad habits" at Pinnacle – volume over value, channel stuffing, undisciplined innovation and low-ROI ads and promotions. Connolly was also aware from his experience transforming Conagra's brands that breaking these bad habits would be immediately expensive to Conagra, negatively disrupting Pinnacle's sales trends and reducing Conagra's margin profile and EPS accretion.

19. Shortly after the merger was complete, on December 20, 2018, Conagra disclosed terrible results for Pinnacle. Defendants admitted that Pinnacle's sales were declining and that Pinnacle was suffering from "bad habits," including trying "to jump-start volume" using "low ROI trade [that] was infused behind price promotion." According to Connolly, Pinnacle's promotional activity was "chasing volume over value."

20. The *Wall Street Journal* clarified Connolly's remarks as "a nice way of saying they ***pushed excess inventory to retailers prior to the deal that was difficult to sell***" – one of Pinnacle's "bad habits" that Defendants were aware of going into the Pinnacle merger.

21. Further, Pinnacle's margin-eroding low ROI promotions, which were used to conceal declining organic net sales volume for 2017 and the first half of 2018, were unsustainable under Connolly's brand strategies. This fact would have been discovered during the due diligence process for the merger where Defendants were provided access to Pinnacle's books and records, promotional contracts and retail scanner data. To be sure, these low ROI promotions were discontinued by Connolly after the Transaction closed in the second half of 2018.

22. In addition, Defendants disclosed that Pinnacle's adjusted gross margin for 2018 was approximately 28%, which was roughly 230 basis points below analyst expectations. Conagra further disclosed that Pinnacle's three leading brands Birds Eye, Duncan Hines and Wish-Bone

had "suffered sales and distribution losses" in 2018 that accounted "for the vast majority of Pinnacle's current challenges" due to ***self-inflicted subpar innovation*** and executional missteps. All of these issues would have been known by Defendants as part of the due diligence process. In fact, in a January 2019 meeting with analysts that was reported on by UBS in a January 23, 2019 note, the Executive Defendants admitted that they knew at the time of the deal of supply chain issues and lost distribution for Wish-Bone, and the SKU proliferation from 12 to 34 for Duncan Himes. After Conagra disclosed these problems at Pinnacle, analysts recalibrated their Pinnacle two-year sales projections downward by about $500 million and profits downward by 25%.

23. Following the December 20, 2018 disclosure of the true state of Pinnacle's business, including declining sales and margins and poor innovation, Conagra's stock price fell $4.81 per share to $24.28 per share, or nearly 17%, wiping out over $2.3 billion in Conagra's market capitalization. On the next trading day, Conagra's stock price declined an additional $2.13 per share, or 8.8%. In fact, in three trading sessions, Conagra stock price declined $8.13 per share, or 30%, to close at $20.96 per share on December 24, 2018, over $14 below the SPO price of $35.25 per share.

24. These declines in the price of Conagra securities caused hundreds of millions of dollars in losses to Conagra investors, who suffered damages when the truth began to be revealed. Lead Plaintiff and Plaintiffs City of Taylor and City of Sarasota seek to recover these losses on behalf of the investors who purchased or otherwise acquired Conagra securities during the Class Period.

## NATURE OF THIS ACTION

25. The claims asserted herein are based on the foregoing facts, among others set forth below, and arise under the Securities Act and the Exchange Act.

26. The Securities Act claims are brought by Plaintiffs individually and on behalf of all persons and entities who purchased or otherwise acquired the common stock of Conagra in or traceable to Conagra's October 2018 SPO, and were damaged thereby.

27. Defendants violated the Securities Act as the Offering Documents for the SPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

28. The Securities Act claims are based solely on strict liability and negligence, and do not allege, arise from, or sound in, fraud. Plaintiffs specifically disclaim any allegation of fraud as to the Securities Act claims.

29. The Exchange Act claims are brought by Plaintiffs individually and on behalf of all persons or entities that purchased or otherwise acquired Conagra common stock from June 27, 2018 through December 19, 2018, inclusive. The Exchange Act claims allege that Conagra and the Executive Defendants acted with scienter in making the misrepresentations and omissions at issue in this case.

## JURISDICTION AND VENUE

30. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and §§11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o).

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa) and §22 of the Securities Act, 15 U.S.C. §77v.

32. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa(c)) and §22 of the Securities Act (15 U.S.C. §77v). Substantial

acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Conagra is headquartered in this District.

## PARTIES

### Lead Plaintiff

33. Lead Plaintiff National Elevator manages the benefits for over 90,000 individuals that are covered under a variety of collectively bargained employee benefits. National Elevator as set forth in the certification previously submitted and incorporated herein by reference, purchased Conagra's common stock at artificially inflated prices during the Class Period and was damaged as a result of Defendants' alleged misconduct. *See* ECF No. 30-2.

### Plaintiff City of Taylor

34. Plaintiff City of Taylor purchased shares in the SPO as detailed in the Certification attached hereto, and has been damaged thereby.

### Plaintiff City of Sarasota

35. Plaintiff City of Sarasota purchased shares in the SPO as detailed in the Certification attached hereto, and has been damaged thereby.

### Defendants

#### Conagra Brands, Inc.

36. Defendant Conagra Brands, Inc. is headquartered in Chicago, Illinois and is one of North America's largest packaged food companies.[2] Its ordinary shares trade on the New York

[2] Previously, the Company was named ConAgra Foods, Inc., but in November 2015, the Company was separated into two independent public companies. The consumer brands business was renamed Conagra Brands, Inc., while the frozen potato business began operating under the Lamb Weston name.

Stock Exchange ("NYSE") under the ticker symbol "CAG." As of February 24, 2019, there were 485,914,676 million ordinary shares of Conagra common stock outstanding.

**The Executive Defendants**

37. Defendant Connolly has served as the CEO of Conagra since April 2015. Prior to joining Conagra, Connolly was the President and CEO of The Hillshire Brands Company from 2012 to 2014 and was previously the CEO for Sara Lee North American Retail and Foodservice, as well as President of Campbell Soup North America.

38. Defendant David Marberger ("Marberger") has served as the Executive Vice President and Chief Financial Officer ("CFO") for Conagra since August 2016. Prior to joining the Company, Marberger served as the CFO at Prestige Brands Holdings, Inc. and Godiva Chocolatier. Early in his career, Marberger spent ten years at the Campbell Soup Company. Connolly and Marberger are collectively referred to as the "Executive Defendants."

39. Connolly and Marberger oversaw Conagra's operations and financial controls, and Conagra could not have completed the SPO without Connolly, Marberger and the Director Defendants (defined herein) signing or authorizing their signatures on the Offering Documents.

40. Defendants Connolly and Marberger are Defendants with respect to both the Securities Act claims and the Exchange Act Claims.

**Director Defendants**

41. Defendant Robert G. Wise ("Wise") has served at all relevant times as the Company's Senior Vice President and Corporate Controller. Wise (although not a director), participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

42. Defendant Anil Arora ("Arora") has served as a Director of Conagra since July 2018. Arora participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

43. Defendant Thomas K. Brown ("Brown") has served as a Director of Conagra since 2013. Brown participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

44. Defendant Stephen G. Butler ("Butler") has served as a Director of Conagra since 2003. Butler participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

45. Defendant Joie A. Gregor ("Gregor") has served as a Director of Conagra since 2009. Gregor participated in preparing the Offering Documents, which she signed pursuant to the requirements of the Securities Act.

46. Defendant Rajive Johri ("Johri") has served as a Director of Conagra since 2009. Johri participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

47. Defendant Richard H. Lenny ("Lenny") has served as a Director of Conagra since 2009 and non-executive chairman since May 2018. Lenny participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

48. Defendant Ruth Ann Marshall ("Marshall") has served as a Director of Conagra since 2007. Marshall participated in preparing the Offering Documents, which she signed pursuant to the requirements of the Securities Act.

49. Defendant Craig P. Omtvedt ("Omtvedt") has served as a Director of Conagra since 2016. Omtvedt participated in preparing the Offering Documents, which he signed pursuant to the requirements of the Securities Act.

50. Defendants Wise, Arora, Brown, Butler, Gregor, Johri, Lenny, Marshall and Omtvedt are collectively referred to herein as the "Director Defendants."

51. The Director Defendants are Defendants only with respect to the Securities Act claims.

**The Underwriter Defendants**

52. Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Mizuho Securities USA LLC, MUFG Securities Americas Inc., Wells Fargo Securities, LLC, Barclays Capital Inc., BTIG, LLC, HSBC Securities (USA) Inc., Scotia Capital (USA) Inc., BNP Paribas Securities Corp., Rabo Securities USA, Inc., RBC Capital Markets, LLC and SunTrust Robinson Humphrey, Inc. each acted as underwriters of Conagra's SPO and assisted in the preparation and dissemination of the materially untrue and misleading Offering Documents.

53. The Defendants referenced in ¶52 are collectively referred to herein as the "Underwriter Defendants."

54. Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially untrue and misleading statements in the Offering documents. The Underwriter Defendants assisted Conagra and the Executive and Director Defendants in planning the SPO and were required to conduct an adequate and reasonable investigation into the business and operations of Conagra – a process known as a "due diligence" investigation. The Underwriter Defendants were required to conduct a due diligence investigation in order to participate in the SPO. During the course of their due diligence investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Conagra's and Pinnacle's operations and financial prospects.

55. In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Conagra's lawyers, management and top executives and made joint decisions regarding: (i) the terms of the SPO, including the price at which Conagra shares would be sold to the public; (ii) the strategy to best accomplish the SPO; (iii) the information to be included in the Offering Documents; and (iv) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Conagra's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the material facts as detailed herein.

56. Each of the Underwriter Defendants acted as part of the underwriting syndicate, which drafted and disseminated the Offering Documents in connection with the SPO and were paid in connection therewith. The Underwriter Defendants were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Offering Documents.

57. The Underwriter Defendants are Defendants only with respect to the Securities Act claims.

58. All of the Defendants are subject to liability pursuant to the Securities Act as the Offering Documents contained materially false and misleading statements and/or omissions of material fact.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### Defendants Misrepresented that Pinnacle's Sales Were Growing and that a Seamless Integration of Pinnacle Would Positively Impact Gross Margin at Conagra

59. During the Class Period Defendants represented that Pinnacle's sales were growing while also stating that integration of Pinnacle into Conagra would be smooth.

60. On June 27, 2018, Defendants filed a Form 8-K with the SEC stating that Conagra's board of directors approved the acquisition of Pinnacle. The Form 8-K and press release represented that as a result of the merger: "The combination of two ***growing*** portfolios of iconic brands will serve as a catalyst to accelerate value creation for shareholders."

61. During a June 27, 2018 slide presentation and conference call, Defendants also represented a "***seamless integration of Pinnacle***" while the "Transaction Enhances Algorithm" for "Key Financial Metrics" stating that the "Impact of Transaction" on "Organic Net Sales Growth" was "=" and the "Impact of Transaction" on "Adj. Gross Margin" was "+." The presentation's takeaway: "What We Want You to Take Away From Today . . . ***Delivers attractive financial returns***."

62. During the June 27, 2018 conference call, Defendants also represented that: Pinnacle's "***full year 2017 net sales were $3.1 billion***" a YOY increase of $17 million and that the merger with Pinnacle would not negatively impact "***Organic Net Sales Growth***," but would instead ***positively impact "Adj. Gross Margin***."

63. Defendants also represented that: "***We expect top line growth to continue at the pace both companies have delivered***, but by combining 2 very strong portfolios, the sustainability of that growth is enhanced. And with the addition of Pinnacle, we expect an ***improved margin profile and EPS accretion*** versus the Conagra base business."

64. The Offering Documents for the SPO reported ***net-sales growth*** at Pinnacle for 2017 and the first half of 2018 and described the merger as "combin[ing] two of the ***fastest-growing companies*** in the consumer packaged foods industry by consumption."

65. The Offering Documents further reported an ***uninterrupted trend of YOY net sales growth from 2015-2017*** and that Pinnacle's net sales grew both in 2017 and the first half of 2018, representing that: (1) for the year ended December 31, 2017, Pinnacle's net sales totaled $3.144

billion, a $17 million increase as compared to 2016; and (2) for the six months ended July 1, 2018, Pinnacle's net sales totaled $1.52 billion, a $10 million increase as compared to the first 6 months of 2017.

66. As described below, the above statements, as well as the reported trend in YOY net sales growth, were false and/or misleading as organic sales began declining in 2017 and continued to decline during the first 6 months of 2018.

67. The Offering Documents and other statements referenced above were further false and/or misleading as they omitted to disclose material facts necessary to make the statements made not misleading and that were required to be disclosed therein, namely that Pinnacle had stuffed the channel through the use of low ROI promotions that cannibalized future revenues and eroded gross margin.

68. The undisclosed minimum impact of Pinnacle's channel stuffing on Pinnacle's reported net sales trend is detailed in the graph below.



69. To conceal the declining trend in net sales, Pinnacle pulled in sales that would have organically occurred in subsequent periods by offering extremely low ROI promotional discounts and other incentives that negatively impacted gross margin.

70. On December 20, 2018, shortly after the merger was complete, Connolly admitted that Pinnacle's bad habit of pushing distribution was meant "to jump-start volume" using "low ROI trade . . . infused behind price promotion." Marberger added that Pinnacle continued its low ROI promotions in the second half of 2018, further masking from investors the true extent of Pinnacle's declining sales trend.

71. Defendants would later also admit that Pinnacle's adjusted gross margin for 2018 declined roughly 230 basis points below analyst expectations, saying the decline was largely the result of Pinnacle's extremely low ROI promotional sales.

72. Defendants further admitted on December 20, 2018 that $30 million of the $160 million cut in Pinnacle sales forecasts for 2018 came from ***walking away from bad ROI promotions after the merger was complete***. Connolly stated that "[a]pproximately $30 million of this miss is driven by our postclose decisions to exit some year-end promotions that we saw as extremely low ROI."

73. But for these "extremely low ROI" promotional sales that borrowed sales from the subsequent quarter, Pinnacle would have reported declining YOY net sales for both 2017 and the first half of 2018. However, instead of disclosing the true nature of Pinnacle and its future sales trends, Defendants misleadingly portrayed Pinnacle's sales as growing when, excluding Pinnacle's unsustainable low-ROI distribution deals, Pinnacle's net sales had actually been declining since 2017.

74. Defendants were also aware that a seamless integration of Pinnacle was not possible without the elimination of Pinnacle's extremely low ROI price promotions, which borrowed sales

from future periods and adversely impacted "Adj. Gross Margin," and that the elimination of these promotions changed Pinnacle's "Organic Sales Growth" trend from positive to negative. The practice employed by Pinnacle to artificially portray net sales as growing, has been described by the SEC as channel stuffing.

75. The SEC has defined channel stuffing as follows:

> [T]he pulling forward of revenue from future fiscal periods by ***inducing customers – through price discounts***, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.

76. The SEC has long required disclosure of this type of earnings management, which it detailed in a complaint filed against the Sunbeam Corporation ("Sunbeam"). The SEC specifically cited that Sunbeam's "undisclosed or inadequately disclosed acceleration of sales through 'channel stuffing'. . . materially distorted the Company's reported results of operations."

77. Former Chief Accountant with the SEC, Lynn Turner, noted the following in 2001:

> The Sunbeam case highlights . . . channel stuffing abuses, among others, and sends a message to registrants and their auditors – the SEC will aggressively attack fraudulent revenue recognition practices. . . . Sunbeam failed to disclose that it offered discounts and other inducements to customers to sell merchandise immediately that otherwise would have been sold in later periods, which threatened to depress Sunbeam's future results of operations. [SAB 104] notes that disclosure in [("MD&A") Management's Discussion & Analysis of Financial Condition] is required of shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

78. Connolly ultimately admitted that Pinnacle's channel stuffing activity was at least partly to blame for the 5% shortfall in sales from Pinnacle's previously communicated 2018 targets and that Pinnacle's historical sales had included "'highly inefficient promotion deals'" that were discontinued in the second half of 2018. According to Connolly, Pinnacle's promotional activity was "'chasing volume over value.'" The *Wall Street Journal* clarified this remark as "a nice way of saying they ***pushed excess inventory to retailers prior to the deal that was difficult to sell***." As

a result of the discontinuation of unsustainable promotions that misleadingly increased sales volume at Pinnacle prior to the merger, Pinnacle's 2018 sales declined to about 5% below Pinnacle's previous 2018 targets and Defendants cut by 25% Pinnacle's expected two-year profit contribution to Conagra.

79. The impact of Pinnacle's pulling forward of sales through unsustainable promotional discounts is illustrated by scanner data, disclosed by Conagra after the Class Period, for Pinnacle's "Big 3" brands, Birds Eye, Duncan Hines and Wish-Bone. [3]




80. As illustrated above, Pinnacle's flag ship brand, Birds Eye, had sales that were artificially inflated as a result of ***sell-ins*** to customers at discounted/promotional prices at year end 2017 and the first 3 months of 2018, resulting in YOY sales growth of over 10%. This was

[3] Retail scanner data consists of weekly pricing, volume and store environment information generated by point-of-sale systems from more than 90 participating retail chains across all United States markets.

accomplished in large part by shipping product that would ordinarily be ordered and shipped in future periods. As a result, Pinnacle customers were loaded up with Birds Eye product and were required to sell off this inventory in subsequent periods. By September of 2018, a month before the merger closed, Defendants knew that Birds Eye sales had plummeted by over 10% resulting in zero YOY growth.

81. Similarly, Pinnacle's Duncan Hines and Wish-Bone brands had been stuffed into the sales channel with customers needing to de-load product that was sold earlier than it was needed (pursuant to discounts or special promotions). As a result of declining demand and an inventory sell down, Defendants knew that Duncan Hines and Wish-Bone sales declined nearly 20% YOY by September of 2018.

82. As a result of the ***sell-ins***, overall Pinnacle net sales declined 2% for the 12 weeks ending November 17, 2018, as the prematurely sold inventory worked its way through the supply chain and Pinnacle discontinued low ROI promotions that had jump started sales volume. Yet, Defendants did not timely disclose the full scanner data, the true reason for the decline or that the decline would both accelerate and continue into future quarters.

83. In sum, Pinnacle's "sell-ins" stuffed the sales channel and concealed that Pinnacle net sales were no longer growing as misleadingly reported. But for ***sell-ins*** of product that was not currently needed by customers, Pinnacle would have reported declining YOY net sales for 2017 and the first 6 months of 2018. In other words, the channel stuffing masked a negative trend – declining net sales – falsely portraying Pinnacle net sales as growing in 2017 and the first half of 2018. Thus, the Offering Documents misleadingly reported YOY net sales growth for Pinnacle for both 2017 and the first 6 months of 2018.

84. Further, while telling investors that integration of Pinnacle and its brands would be "seamless," Defendants concealed that integration included the discontinuation of Pinnacle's "bad

habits," a process that would continue to negatively impact future quarters, as Defendants ultimately disclosed on December 20, 2018. The impact of the breaking of bad habits on Pinnacle and the combined companies is illustrated by the chart below.

Figure 1: Pinnacles sales growth, which is included in Conagra scanner data, negatively impacted Conagra tracked channel growth by ~200 bps in FQ4




Source : Deutsche Bank, Nielsen

85. As a result of its channel stuffing through low ROI promotional sales, Pinnacle showed retail sales growth for 2017 and the first half of 2018, peaking in April 2017 when Conagra and Pinnacle were engaged in earlier merger negotiations. However, once these unsustainable low ROI promotional sales were discontinued, retail sales declined sharply as indicated in the above red line that peaks in 2017 and hits bottom in early 2019. Pinnacle became a drag on the combined companies' retail sales starting in the second half of 2018.

**Item 303 Required Disclosure of Known Trends or Uncertainties**

86. Defendants were explicitly required to disclose the impact of increased channel inventory on reported net sales. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303")

required Defendants to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). Similarly, the regulation required Defendants to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

87. Within SEC Staff Accounting Bulletin: No. 104 ("SAB 104"), the SEC Staff provides specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenue: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

88. The SEC also provides a relevant example of a required MD&A disclosure in light of a changing sales trend. For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share or a combination of conditions.

89. Item 303 and analogous SEC guidance are clear: Defendants were required to disclose the underlying reasons behind Pinnacle's declining net sales. Instead, Defendants concealed the extent to which Pinnacle relied on the pulling forward of future sales to artificially

inflate net sales, and that Pinnacle had used unsustainable low ROI promotional sales to artificially inflate net sales and to conceal softening demand.

**The Impact of Channel Stuffing on Future Results**

90. In addition to the impact on reported quarterly revenues, Defendants were required to disclose the impact of channel stuffing on future financial results.

91. Within SAB 104, the SEC staff provides the following specific examples of required disclosures pertaining to the Company's recognition of revenue: "Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period."

92. The significant financial impact of channel stuffing on future financial results is precisely the type of information required to be disclosed under the SEC's MD&A rules. For example:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition.
>
> * * *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance.

93. Pinnacle's net sales in subsequent quarters was impacted by the "pulling-in" or "borrowing" of net sales from future quarters. As a result, Defendants were required to warn investors that reported net sales were not indicative of future net sales.

**The Channel Stuffing Was Material as It Masked a Change in Trend in Pinnacle Net Sales**

94. SEC Staff Accounting Bulletin: No. 99, *Materiality* ("SAB 99"), sets forth the generally accepted methods to evaluate materiality as it relates to the financial statements of SEC

registrants. SAB 99 specifies numerous factors that clearly indicate accounting and disclosure violations that were material. SAB 99 states that:

> ***The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item.***

SAB 99 also states that both "'quantitative'" and "'qualitative'" factors must be considered in assessing materiality.

95. The channel stuffing, as described above, materially affected Pinnacle's net sales trend. Defendants misleadingly disclosed increasing Pinnacle net sales when channel stuffing concealed a trend of softening demand for Pinnacle products and a declining trend in Pinnacle net sales.

96. The statements set forth in ¶¶60-65, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a) Pinnacle's net sales began declining in 2017 and would continue to decline in 2018 and 2019;

(b) Pinnacle concealed declining sales trends beginning in 2017 by stuffing its sales channel with low ROI promotions;

(c) Pinnacle's gross margin was compromised by the use of channel stuffing via low ROI promotions to mask declining demand for Pinnacle products;

(d) Pinnacle's "Big 3" brands Birds Eye, Duncan Hines and Wish-Bone's retail sales and distribution were declining;

(e) Wish-Bone was suffering from supply chain issues and lost distribution and Duncan Hines was suffering from stock keeping unit ("SKU") proliferation; and

(f) Pinnacle was in fact suffering from poor product innovation and instead relied on expensive margin killing trade promotions to drive volume.

**Defendants Falsely Claimed that Birds Eye Sales Growth Was Driven by Robust Innovation**

97. The Offering Documents also falsely stated that 3Q18 declines:[4]

> [I]n Pinnacle's Grocery segment, [were] partially offset by ***ongoing growth*** in Pinnacle's Frozen segment, ***led by the Birds Eye franchise***, which continued to drive Pinnacle's robust innovation program. . . . Profitability was driven by strong continued execution of Pinnacle's productivity and cost management programs.

98. This statement was false and misleading: (a) as illustrated by the above retail scanner data, Birds Eye had a stark 10% decline in retail sales after the 1Q18; and (b) because Birds Eye was in fact suffering from poor product innovation it was relying on expensive margin killing trade promotions to drive volume.

**Defendants Misrepresented the Benefits of the Acquisition and Conagra's Expected Integration of Pinnacle**

99. In the June 27, 2018 press release, the Company represented that the combination of Pinnacle and Conagra would have the following "Compelling Strategic and Financial Benefits":

> - **Complementary Portfolio of Iconic Brands**: The combined company will have a portfolio of leading, iconic brands within attractive domains such as frozen & refrigerated meals and snacks & sweet treats.
>
> - **Enhanced Ability to Capitalize on Trends in Frozen Foods**: The combination will bring together complementary portfolios in the large, growing and on-trend frozen foods category, positioning the combined company to accelerate innovation and benefit from long-term tailwinds.
>
> - **Compelling Growth Profile**: Conagra Brands and Pinnacle Foods are two of the fastest-growing companies in the consumer packaged foods industry by consumption, and Conagra Brands expects continued momentum based on the enhanced scale and new opportunities to partner with customers that the transaction will provide.

---

[4] Quarters are designated by quarter number followed by the letter Q, thus 3Q18 indicated third quarter in 2018.

- **EPS Accretive**: On a percentage basis, Conagra Brands expects the transaction to be low single-digit accretive to adjusted EPS in the fiscal year ended May 2020 and high single-digit accretive to adjusted EPS in the fiscal year ended May 2022.

- **Significant Synergy Opportunities**: Conagra Brands expects to achieve approximately $215 million in annual run-rate cost synergies by the end of fiscal year 2022, with one-time cash costs to achieve the synergies estimated at approximately $355 million, inclusive of expected capital expenditures of approximately $150 million.

- **Financing Maintains Solid Investment Grade Credit Rating and Dividend Rate**: The transaction is expected to be financed by Conagra Brands equity issued to Pinnacle Foods shareholders, new transaction debt and incremental cash proceeds from a public equity offering and/or divestitures.

- **Proven Integration Capabilities**: In recent years, Conagra Brands has established a proven track record of executing strategic transactions. The two organizations share complementary portfolios, supply chains, and results-oriented cultures, which are expected to facilitate integration.[5]

100. The Company further represented in the press release, in relevant part, the following:

> The ***combination of two growing portfolios*** of iconic brands will serve as a ***catalyst to accelerate value creation for shareholders***. The transaction will enhance Conagra Brands' multi-year transformation plan and expand its presence and capabilities in its most strategic categories, including frozen foods and snacks. ***With annual net sales in excess of $3 billion***, Pinnacle Foods' portfolio of frozen, refrigerated and shelf-stable products includes such well-known brands as *Birds Eye, Duncan Hines, Earth Balance, EVOL, Erin's, Gardein, Glutino, Hawaiian Kettle Style Potato Chips, Hungry-Man, Log Cabin, Tim's Cascade Snacks, Udi's, Vlasiand Wish-Bone*, among others. Based on both companies' latest fiscal year results, pro forma net sales would have been approximately $11 billion.

101. On June 27, 2018, Conagra filed a Form 8-K again noting that the "combination of ***two growing portfolios*** of iconic brands will serve as a ***catalyst to accelerate value creation for***

[5] The press release was also expressly incorporated by reference into the Offering Documents. *See*, Conagra Brands, Inc., Form S-3 Registration Statement and Prospectus dated October 9, 2018, at 1-2.

***shareholders***." Connolly further emphasized that the Company was "creating a ***tremendous platform to drive meaningful shareholder value***."

102. The press release also emphasized that: "Our pending acquisition of Pinnacle . . . will further enhance our progress and we expect it will provide incremental opportunities to ***capture value for our shareholders***."

103. During the June 27, 2018 conference call discussing the Transaction, Connolly similarly highlighted that the Company was enhancing its scale by "combining ***2 growing portfolios*** of iconic brands" by acquiring "a portfolio of ***complementary***, leading brands that strengthens our scale, enhances our position in the attractive frozen space and provides more opportunities for innovation." Further, he represented that "the cultures at Conagra and Pinnacle are ***highly complementary*** and that our organizations are a natural fit. Much like Conagra, Pinnacle shares our focus on innovation and on maintaining a lean and efficient operating structure and close ties with customers."

104. As to the acquisition, Connolly stated that the Company had a "strong leadership team and ***proven capabilities*** driving brand building and innovation" and was "confident in [its] ability to ***successfully integrate*** this acquisition and to build continued momentum and deliver meaningful shareholder value." Additionally, Connolly underscored that Pinnacle's "excellent cultural and operational fit," "coupled with our ***proven track record of executing strategic transactions***," would result in a "***smooth integration process***."

105. Throughout the conference call, Defendants repeatedly touted the Transaction's value for shareholders representing that:

> Today's announcement of our agreement to acquire Pinnacle Foods builds on the strong foundation we've established and serves as a ***catalyst to accelerate value creation for shareholders***. It will enhance our scale by ***combining 2 growing***

> ***portfolios of iconic brands*** and create a leader in frozen food while expanding our presence in snacks.[6]

106. Connolly also emphasized the "complementary" nature of the two portfolios stating:

> We're bringing together 2 highly complementary companies with a strong combined balance sheet, positioning us to ***capture compelling financial benefits*** including attractive synergies. Importantly, with a strong leadership team and proven capabilities driving brand building and innovation, ***we're confident in our ability to successfully integrate this acquisition and to build continued momentum and deliver meaningful shareholder value***.

107. In addition, Connolly reassured investors that the Company's "proven track record of executing strategic transactions" would make the Pinnacle acquisition a "***smooth integration process.***"

108. In response to an analyst question regarding the reason behind the stock price decline in Conagra and Pinnacle shares upon the announcement of the merger, Connolly further reiterated:

> What I can tell you is I have total confidence that by combining these 2 companies, we will ***only accelerate the strong shareholder value creation track record that we have been delivering*** . . . . These are 2 portfolios that fit perfectly together. And in fact, looking at it right now, ***I think this is just an outstanding investment opportunity***.

109. The presentation for the June 27, 2018 conference call also reaffirmed Connolly's statements that the acquisition of Pinnacle "combines ***two portfolios with industry-leading growth***," "is a ***catalyst to accelerate value creation for shareholders***" and would "deliver[] ***attractive financial returns.***" In addition, the slides stressed that Conagra had the "leadership team, capabilities, and balance sheet to successfully execute and integrate this transaction and ***deliver shareholder value***."

---

[6] The transcript of Conagra's 4Q18 financial results was also attached to a Form 425 filed on June 28, 2018.

110. Connolly similarly reassured investors that "we will be able to implement a ***smooth integration process***, . . . we expect attractive financial returns with an IRR above our WACC and EPS accretion in the first full fiscal year [Fiscal Year End ("FYE") July 2020] following close [October 2018]." Connolly further explained that the Transaction "price represents a 15.8x adjusted EBITDA multiple before synergies based on Pinnacle's estimated fiscal year 2018 results, and 12.1x adjusted EBITDA including run-rate cost synergies. We expect the transaction to be accretive to EPS in fiscal '20 [FYE July 2020], with that accretion increasing as strong cost synergies phase in."

111. Defendants also presented a slide representing that the "Transaction Enhances Algorithm" for "Key Financial Metrics" stating that the "***Impact of Transaction" on "Organic Net Sales Growth" was "=" and the "Impact of Transaction" on "Adj. Gross Margin" was "+."***

112. Defendants also represented that: Pinnacle's "full year 2017 net sales were $3.1 billion," that the merger with Pinnacle would not negatively impact "***Organic Net Sales Growth***," but would instead ***positively impact "Adj. Gross Margin***," that "Pinnacle has been a ***leader in innovation*** and has delivered solid top line results over time" and that "Pinnacle shares our focus on ***innovation***."

113. The statements set forth in ¶¶99-112, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a) Pinnacle's net sales had been declining since 2017;

(b) Pinnacle concealed declining net sales trends by stuffing its sales channel with low ROI promotions;

(c) Pinnacle's gross margin was compromised by the use of channel stuffing via low ROI promotions to mask declining demand for Pinnacle products;

(d) The discontinuation of Pinnacle's low-ROI promotions eliminated sales growth at Pinnacle;

(e) Pinnacle's "Big 3" brands Birds Eye, Duncan Hines and Wish-Bone's retail sales and distribution were declining;

(f) Wish-Bone was suffering from supply chain issues and lost distribution and Duncan Hines was suffering from SKU proliferation;

(g) The integration process would not be "smooth" because "successful integration" required Conagra to break Pinnacle's bad habits;

(h) Pinnacle was in fact suffering from poor product innovation and instead relied on expensive margin killing trade promotions to drive volume.

114. On September 4, 2018, at the Barclays Global Consumer Staples Conference, Connolly characterized Pinnacle's biggest business, Birds Eye, as "an absolutely terrific business. It's been a juggernaut and it's incremental to what we do. And by the way, we think it opens up opportunities for us to apply some of our brands in that space . . . ." Connolly then emphasized the Transaction as "a no-brainer":

> With respect to Pinnacle, ***this is as much of a no-brainer of a deal as I think you're going to see.*** I don't know that you'll see any large deal that is – looks this much like a bolt-on as Pinnacle does. This is a company that is very similar in their core to what we do in our core, similar types of businesses and very similarly – very similar culturally. Lots of things we like about the portfolio, we like the margin structure on some of the grocery businesses, we like the growth prospects in frozen. But obviously, the thing we like most about it comes back to our unshakable belief that frozen is a space that has, call it, 10 years or more of runway. And when you look at Pinnacle's portfolio versus our portfolio, what you see are terrific assets that are not redundant to what we do, they're additive and incremental to what we do.

115. Similarly, while attempting to re-assure shareholders of the alleged value of the Transaction when questioned about weak Pinnacle scanner data, Connolly stated:

> So Pinnacle is its own company right now and it probably would be inappropriate for me to comment on another company's results, but what I would say is, I

> ***wouldn't worry too much around a lack of focus around deal dynamics***, because one of the things that you've seen with Pinnacle is, this is a ***true performance-oriented team***. They are all about ***delivering results and their compensation programs are entirely based on performance and on results***, and that doesn't change. So the shareholders' interest in terms of the performance of the business and the interest of the management team in terms of getting paid for delivering performance remains squarely aligned. The only other comment I'll make is just to direct people back to Mark's comments on their last quarterly call around things like some of the comps that they were facing on businesses like Duncan Hines would represent some ***short-term challenges***.

116. Also during the conference, an analyst from Barclays Bank PLC questioned why Pinnacle "'settled'" for a $68 per share price, "which was below what I think many in the investment community might have expected," and asked Connolly if there was something wrong with Pinnacle's fundamentals "so that the outlook is somehow compromised." In response, Connolly detailed the due diligence of the deal:

> Yes, I think the way to think about this is, we've been looking at this for a while and we know food businesses, we've been – spent our whole career in the food industry. So I – we've been very clear-eyed from the beginning as to what the synergy prospects were with this company and what we believed were the true perpetual growth rates that were tangible for this company going forward. And we used those assumptions to arrive at a valuation that we thought was fair and reasonable.

117. On September 21, 2018, Conagra filed a Form 425 attaching a Pinnacle Acquisition Update that again announced the Company's excitement to combine "both Conagra and Pinnacle's ***growing portfolios*** of iconic brands."

118. On September 21, 2018, Conagra held its Annual Shareholders Meeting where Connolly again proclaimed that: "Pinnacle Foods makes well-known brands such as Birds Eye, Duncan Hines, Earth Balance, EVOL, Vlasic Pickles and Hungry-Man. ***We believe this acquisition is highly compelling***."

119. On Conagra's September 27, 2018 1Q19 earnings call, in response to an investment analyst wanting to know about "trade relative to A&P at Pinnacle," Connolly again reassured

investors by saying "***we are incredibly excited about the Conagra-Pinnacle combination, . . . we will . . . go deep on each and every brand*** and begin applying our Conagra playbook as appropriate."

120. On the September 27, 2018 conference call, Defendants continued to claim seamless integration of Pinnacle despite the fact that Defendants knew they would need to break Pinnacle's "bad habits" if the integration was to be both seamless and accretive.

121. The Offering Documents for the October 2018 SPO contained the false and misleading statements detailed above.

122. On October 26, 2018, Conagra filed a Form 8-K with the SEC announcing the completion of the Pinnacle Foods acquisition. The 8-K continues to paint a rosy picture reiterating that the "'acquisition of Pinnacle Foods ***creates a tremendous opportunity to drive profitable growth and shareholder value*** by further leveraging our proven approach to innovation, brand-building, operational excellence and deep customer relationships.'"

123. The statements set forth in ¶¶114-122, *supra*, were materially false and misleading or omitted material information necessary to make them not misleading for the following reasons:

(a) Pinnacle's net sales began declining in 2017 and would continue to decline in 2018 and 2019;

(b) Pinnacle concealed declining sales trends beginning in 2017 by stuffing its sales channel with low ROI promotions;

(c) Pinnacle's gross margin was compromised by the use of channel stuffing via low ROI promotions to mask declining demand for Pinnacle products;

(d) Connolly's plan to discontinue Pinnacle's low-ROI promotions meant that integration of Pinnacle would be an expensive long-term challenge that would negate substantial growth and profitability for at least two years;

(e) Pinnacle's "Big 3" brands Birds Eye, Duncan Hines and Wish-Bone's retail sales and distribution were declining;

(f) Wish-Bone was suffering from supply chain issues and lost distribution and Duncan Hines was suffering from SKU proliferation; and

(g) Pinnacle was in fact suffering from poor product innovation and instead relied on expensive margin killing trade promotions to drive volume.

## ADDITIONAL SCIENTER ALLEGATIONS FOR EXCHANGE ACT CLAIMS

### Defendants Due Diligence for the Pinnacle Acquisition Would Have Necessarily Revealed that Pinnacle Sales Were in Steep Decline and that Pinnacle Concealed This Fact by Artificially Inflating Its Results Through Channel Stuffing and Unsustainable Low ROI Promotions

124. Defendants conducted due diligence of Pinnacle as part of the acquisition. To facilitate Conagra's due diligence, Pinnacle, among other things, provided Conagra with access to an electronic data room responsive to a due diligence request. The electronic data room included a copy of the 2018 Modified Management Case for fiscal years 2018 through 2020.

125. Defendants' due diligence necessarily revealed that organic sales declines at Pinnacle had started in 2017 and were continuing in 2018. Specifically, through the review of Pinnacle's books and records, scanner data and marketing and promotional contracts with large grocery retailers (whom Conagra and Pinnacle both sold to) Defendants became aware that Pinnacle distribution and sales were unsustainable, would be decreasing in the second half of 2018 and would continue to decrease for Bird Eye, Duncan Hines and Wish-Bone as a result of the discontinuation of low ROI promotions and the corresponding need of customers to de-load product that had been shipped earlier than scheduled in an attempt to make Pinnacle sales appear more robust when it was being courted for acquisition by Conagra, as illustrated by the chart in ¶84 *supra*.

126. In addition, the review of marketing and promotional contracts with supermarkets and other retailers also revealed that distribution would decline per the terms of those contracts if they were not renewed for the second half of 2018 or 2019. Defendants themselves ultimately admitted at the end of the Class Period that at least $30 million of the $160 million cut in Pinnacle sales forecasts for 2018 came from walking away from bad year-end ROI promotions. Connolly stated that "[a]pproximately $30 million of this miss is driven by our postclose decisions to exit some year-end promotions that we saw as extremely low ROI."

127. Furthermore, declining margins were a red-flag that Pinnacle had been pursuing volume through the use of discounts, joint marketing payments and/or slotting fees to retailers. In fact, Pinnacle's 2018 adjusted gross margin declined by 230 basis points from the anticipated 30.2% to 27.9%, largely as a result of promotional payments and discounts that were required to load up customers with product earlier than required. This activity, by design, inflated sales and distribution in the pre-acquisition period and made Pinnacle sales appear more robust than those that would have occurred as a result of organic demand.

128. But for the channel stuffing and promotional pricing that it required, Pinnacle would have been unable to report growth in net sales for 2017 and the first half of 2018. Thus, Pinnacle's channel stuffing activity rendered the Offering Documents false and/or misleading as they expressly incorporated artificially inflated net sales numbers, reporting positive net sales growth for 2017 and the six-month period ending July 1, 2018. The reported net sales were false and/or misleading as they borrowed future period net sales in order to falsely portray net sales growth. As a result of this practice of borrowing future period sales to hide the trend in declining net sales, the net sales reported in the Offering Documents for 2017 and the six-month period ending July 1, 2018 were false and/or misleading.

129. The sell-ins or channel stuffing was further misleading as these sales required special promotional discounts to incentivize customers to take unwanted inventory early. Defendants were aware that once special promotional programs expired, Pinnacle distribution and sales would decline during the second half of 2018. Both the sell-ins and channel stuffing would have been revealed to Defendants through their review of accounting materials, marketing and promotional contracts and scanner data as part of the Pinnacle acquisition due diligence process. Furthermore, Conagra's business with the same retail super markets would have provided further insight as to the presence of key Pinnacle product promotions, discounts and sales activity with respect to Birds Eye, Duncan Hines and Wish-Bone as their joint customers.

130. The Executive Defendants admitted that they were aware at the time of the deal of supply chain issues and lost distribution for Wish-Bone and SKU proliferation for Duncan Hines.

131. Additionally, Defendants were aware that promotional induced sell-ins were not sustainable. In fact, for the period covering August-November 20, 2018, which immediately followed the announcement of the proposed merger in June 2018, Pinnacle advertising and promotional expenditures declined by a dramatic 19%. Defendants understood that this drop in promotional spending would be accompanied by a corresponding sales decline as some existing incentives to customers were no longer being offered.

**Defendants' Knowledge of Pinnacle's Business Before the Merger**

132. The Conagra/Pinnacle merger can be traced back to 2014 when Connolly executed an agreement to merge Pinnacle with Hillshire Brands, Inc. ("Hillshire"), back when Connolly was CEO of Hillshire. The Hillshire/Pinnacle merger agreement touched off competing bids for Pinnacle, with Hillshire ultimately becoming the target, acquired by Tyson Foods, Inc. When the dust settled, Pinnacle and its iconic brands remained independent.

133. In 2015, after Hillshire was acquired by Tyson Foods, Inc., Connolly left Hillshire and found a new job as Conagra's CEO, but his interest in acquiring Pinnacle and its iconic brands remained strong. Connolly then teamed up with JANA, an activist hedge fund that acquired a 9% stake in Conagra in the first half of 2015, to rid Conagra of its private label business, transitioning Conagra into a pure brand business – similar to Pinnacle.

134. As CEO, Connolly's strategy to transform Conagra's brands involved breaking what Connolly called brand "bad habits." Connolly remarked in 2016 that "ConAgra historically prioritized volume over value" and that Conagra's transformation would strive for a higher-quality revenue base – better food, with better branding, sold at a higher profit. According to Connolly, the four "bad habits" included:

- "***focus on volume***" (instead of "value creation")
- "***reliance on trade/push***" (aka, channel stuffing)
- "***undisciplined innovation***"
- "***low ROI A&P support***" (aka, low return advertisements and promotions).

135. In 2016, as Connolly again attempted to acquire Pinnacle, he knew that a "successful and "seamless" integration of Pinnacle and its brands into Conagra's portfolio and distribution channels meant that Pinnacle would also need to be transformed to a higher-quality revenue base within its stable of iconic brands. However, because Pinnacle – like Conagra – had a history of chasing volume over value, and other "bad habits," Connolly expected Conagra to undertake a costly, time-consuming process of breaking these bad habits to integrate the Pinnacle brands.

136. Nevertheless, armed with complete information about Pinnacle and its business, including its brands' "bad habits," in late 2016, Connolly re-approached Pinnacle about a potential acquisition, this time by Conagra. Thereafter, in the first quarter of 2017, the Conagra board

(including the JANA-sponsored directors) continued to study a potential acquisition of Pinnacle, with the help of Conagra's financial advisor, Defendant Goldman Sachs.

137. In March 2017, with the blessing of the Conagra board, Connolly proposed to Pinnacle that Conagra purchase 100% of Pinnacle's outstanding equity for $66.00 per share, consisting of 60% cash and 40% Conagra common stock.

138. Although Pinnacle rejected Conagra's March 2017 acquisition proposal, Conagra was undeterred and continued to carefully study Pinnacle and its performance. In December 2017, the Conagra board (including the two JANA sponsors) spent two consecutive days discussing Pinnacle and concluded that Conagra should persist in its efforts to acquire Pinnacle, authorizing Connolly to re-engage Pinnacle at will.

139. Coincidentally, in January 2018, Pinnacle approached Conagra about entering into a supply chain partnership. But, Conagra had long studied Pinnacle's supply chain dynamics and related "bad habits" and had concluded that fixing Pinnacle's supply chain without benefiting from brand ownership was a non-starter. On April 17, 2018, Connolly told Pinnacle that Conagra rejected a supply chain partnership, but was willing to explore an acquisition of Pinnacle.

140. Two days later, in a pincer move, Conagra investor JANA (with its two Conagra board seats) announced that it had taken a 9.5% stake in Pinnacle for purposes of exploring the sale of Pinnacle and that JANA had retained former Safeway Inc. marketing executive Diane Dietz ("Dietz") (just like it had done with Conagra) to consult JANA as to Pinnacle's operations. JANA signaled that it would insist on Pinnacle directorships at the next Pinnacle annual meeting if Pinnacle was not sold before then. The die was cast.

141. In May 2018, Conagra dusted off its 2017 offer and again proposed to acquire 100% of Pinnacle's outstanding equity for $66.00 per share (the same price as in March 2017, this time with 65% cash and 35% Conagra stock). Discussions and diligence ensued, and by the end of the

month Conagra sweetened its bid to $68.00 per share, 65% cash and 35% Conagra stock. After a slight adjustment in the proportions of cash and stock, the deal was finalized on June 26, 2018 for $68.00 per share, cash and common stock.

142. After nearly four years trying to acquire Pinnacle, Connolly was not going to let anything get in the way of closing the Pinnacle deal, including any news that Conagra expected negative financial results because Pinnacle's brands needed to be fixed. Further, Connolly was also not about to burn Conagra's significant shareholder and partner JANA, who had a 9.5% investment in Pinnacle, by disclosing known bad news about Pinnacle's brands.

143. JANA is a hedge fund engaged in shareholder activism and other opportunistic investments. For example, in 2017 JANA disclosed an 8.8% stake in Whole Foods Market Inc. ("Whole Foods") saying that it intended to change Whole Foods' corporate governance. Later that year, JANA sold its stake in Whole Foods (as part of Amazon.com, Inc.'s acquisition of Whole Foods) for a profit of about $300 million.

144. Since 2015, JANA was aligned with Connolly's goals to grow Conagra by breaking brand "bad habits" and transforming iconic brands. JANA, for its part, entered into a "standstill agreement" with Conagra to permit Conagra to execute this "brand" strategy, put two JANA-sponsored directors on the Conagra board (including former Nestlé CEO Brad Alford ("Alford")), and recruited a market distribution expert, Dietz, to provide JANA with critical, non-public market intelligence about the potential to spot brand "bad habits" (such as low-ROI promotions), transform iconic brands and ultimately increase Conagra's profitability.

145. In essence, JANA exerted significant influence over Conagra, so Defendants hid the truth about Pinnacle in part to protect JANA.

146. Since June 2015, when it first announced a 7.2% stake in Conagra, JANA has exerted control of Conagra's direction and strategic alternatives, evidenced by:

(a) JANA's significant equity stake in Conagra of nearly 10%;

(b) JANA's ability to cause Conagra to amend its bylaws in June 2015 to extend the deadline to nominate directors;

(c) JANA's ability to cause Conagra to enter into a "cooperation agreement" (aka "standstill agreement") with JANA;

(d) JANA's ability to cause Conagra to increase board membership to include two additional seats on the Conagra board of directors, to be filled by JANA-designated directors;

(e) JANA's ability to cause Conagra to permit JANA to have up to two board directorships on spin-offs of Conagra;

(f) JANA's influence over Conagra to dispose or spin-off businesses, including Ralcorp Holdings and Lamb Weston Holdings, Inc.; and

(g) JANA's ability to cause Conagra to give it confidential information.

147. In connection with its Conagra investment, in June 2015, JANA retained Dietz, a marketing executive formerly with Safeway Inc., and President and CEO of Rodan & Fields, LLC, a premium skincare brand, ostensibly to provide JANA market intelligence related to Consumer Packaged Goods ("CPG"). Also, JANA selected Alford, former CEO of Nestlé, as one its Conagra board designees, giving JANA particular CPG market insights into the frozen food businesses.

148. No later than February 21, 2018, JANA began purchasing large blocks of shares of Pinnacle and was engaged in discussions with Pinnacle's management during this time. Also, in April 2018, Dietz, Pinnacle's consultant vis-à-vis Conagra, was also purchasing shares of Pinnacle. That month, JANA disclosed a 9.5% stake in Pinnacle and announced its intention to cause Pinnacle to consider consolidation opportunities "as a result of its scale position in the frozen foods sector."

149. When Conagra purchased Pinnacle later in 2018, JANA realized a profit of approximately $120 million on its $600-plus million Pinnacle investment.

150. In October 2018, JANA agreed to purchase $200 million of Conagra common stock in the October SPO to ensure completion of Conagra's acquisition of Pinnacle.

**LOSS CAUSATION/ECONOMIC LOSS**

151. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Conagra common stock and operated as a fraud or deceit on Class Period purchasers of Conagra common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through disclosure of the previously concealed truth, the price of Conagra common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Conagra common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

152. From late October to mid-December, news began to leak out about Pinnacle's lower revenues due to limited scanner data. However, due to Defendants' prior statements, investors and analysts believed this issue was short term and were not aware of the structural challenges facing Pinnacle's business, including the sell-ins, channel stuffing, price promotions and other practices of which Defendants were aware.

153. For example on November 14, 2018, a J.P. Morgan analyst report detailed declining Nielsen scanner data for Pinnacle in "the wake of a competitor's downgrade of CAG." Following the publication of the declining Pinnacle retail scanner data on November 14, 2018, Conagra's common stock declined $2.55 per share over 7% as compared to a market index decline of only .75%.

154. A December 14, 2018 UBS analyst report noted that Conagra's stock price decline of 15% in recent weeks was due in part to Pinnacle sales slowdown and was "priced in" the stock, and its problems were "fixable" and not "structural" issues.

**On December 20, 2018, Conagra Disclosed a Decrease in Pinnacle Sales and Gross Margin Due in Large Part to Pinnacle's "Highly Disappointing" Performance Across Its Three Leading Brands**

155. Less than two months after the close of the merger, on December 20, 2018, Conagra stunned the market by releasing disappointing 2018 sales results for Pinnacle. Defendants reported weakness in Pinnacle sales, which were now estimated to be "about $160 million or 5% below Pinnacle's target. Approximately, $30 million of this miss [was] driven by [the Company's] postclose decisions to exit some year-end promotions that [they] saw as extremely low ROI." Defendants further disclosed that "we are absolutely stopping the initiatives that we can responsibly stop" and that "the deterioration in the legacy Pinnacle business over the course of calendar year 2018 means we have some hard work to do."

156. Further, Defendants revealed that their assurances over the past months that the acquisition of Pinnacle would "accelerate value creation for shareholders," "capture compelling financial benefits" and generate a "compelling growth profile" and "significant synergy opportunities" were not true. The Company disclosed that Pinnacle's three leading brands, Birds Eye, Duncan Hines and Wish-Bone, had "suffered sales and distribution losses" in 2018 and accounted "for the vast majority of Pinnacle's current challenges" due to self-inflicted subpar innovation and executional missteps.

157. According to Connolly "innovation and execution came up short" and "innovation was insufficient to sustain growth, primarily because it was subpar in its execution." Further, Connolly highlighted that "[t]hese missed steps ultimately undermined brand strength and pricing

power, while gross productivity was insufficient to make up for operation offsets like a major product recall."

158. Connolly himself admitted that the results for the Pinnacle segment were clearly "highly disappointing" for the second half of 2018 because historically, "Pinnacle's gross margin performance was lower in the front half of the calendar year than the back half." Defendants disclosed that Pinnacle's adjusted gross margin for 2018 was approximately 28%, which was roughly 230 basis points below Pinnacle's internal target. For fiscal year 2019, Conagra estimated, for the seven month period that Pinnacle would be combined with Conagra, the Pinnacle segments "net sales will be down mid-single digits for our fiscal year 2019 versus the same period a year ago. This equates to $1.7 billion to $1.75 billion in Pinnacle net sales for the 7-month period that Pinnacle will be included in Conagra Brands for fiscal 2019." Marberger added: "given the volume declines that Sean's discussed on the big 3, Pinnacle attempted to add price promotions on the second half to make up for the volume. These were not efficient programs and resulted in additional price erosion."

159. One Barclay's analyst commented on the earnings call that "it certainly sounded to us that you thought maybe initially that some of that Pinnacle margin opportunity could be delivered upon under Conagra's ownership." He then continued to question whether the "Pinnacle asset [is] just in a completely different place" as the situation seems "far more severe" than he was thinking.

160. In the wake of Conagra's disclosure, a number of financial analysts and financial press outlets published reports. For example:

(a) On December 20, 2018, the *Wall Street Journal* noted that: "Conagra did say that Pinnacle's activity was 'chasing volume over value.' That appears to be a nice way of

saying they pushed excess inventory to retailers prior to the deal that was ultimately difficult to sell."

(b) On December 20, 2018, JP Morgan published an analyst report where it emphasized that the "erosion of Pinnacle's business was so big (and happened so fast) that it likely left some investors spooked and unwilling to look at CAG for a while." Additionally, the report noted that "CAG had industry sources (customers, *e.g.*) that could have set off warning flares months ago." Further, the report labeled Connolly as having "done a 180-degree turn regarding [Pinnacle]'s innovation acumen" and that the analyst could not recall a "CEO so deeply criticizing the decisions made within a business acquired only two months prior."

(c) On December 20, 2018, RBC reported that Conagra's "guidance for Pinnacle implies a ~5% and ~25% decline in that business sales and profit in FY19."

(d) On December 20, 2018, Credit Suisse reported a big decline in 2020 EPS to $2.16 and a "massive 25% revision in Pinnacle's profit base to $435M." Further, the report highlighted that "[m]anagement slashed expectations for the $10.9B Pinnacle acquisition for the next 12 months" and that:

> [T]he severity of the cut could be perceived as sending a signal to investors that management walked into a bad deal and overpaid even though it had plenty of time to evaluate the risks and rewards of pursuing it. It will take a lot of work and time to regain investor confidence in the transaction.

Credit Suisse also noted that Pinnacle would not be able to recover until the "fiscal 2H20 [second half of 2020]" as Pinnacle would require a "massive rebase in its sales and margin structure." Pinnacle and its CEO "own" the responsibility for the due diligence on Pinnacle.

(e) On December 20, 2018, JP Morgan reported that: "[Pinnacle]'s downside risk [was] bigger than we thought." The report also detailed that for fiscal year 2019, synergy for Pinnacle of $20 million vs. $37 million barely covered deal amortization of $17 million.

(f) On December 20, 2018, Morningstar reported: "We don't expect the acquisition of Pinnacle Foods to have a significant impact on Conagra's competitive positioning."

(g) On December 21, 2018, RBC Capital Markets stated that the Company:

> [D]isclosed yesterday a litany of previously-unknown execution issues in the acquired Pinnacle business. Considering how many viewed Pinnacle as the vanguard of innovation and execution within US Food, we were surprised to hear that its franchise BirdsEye brand now faces high-single-digit distribution losses along with accelerating double-digit sales declines from the Duncan Hines and Wish-Bone brands.

(h) On December 21, 2018, Jefferies reported investors' concerns that the issues Pinnacle faced were "bigger than expected, structural in nature," and would lead to "multiple downward revisions in guidance."

(i) In a December 21, 2018 report, Barclays noted that "[w]hile some of this was likely less visible to CAG until the deal closed, by the same token, we believe some of these observations could have been ascertained beforehand given CAG and [Pinnacle]'s overlapping categories."

(j) On December 21, 2018, Barclays further reported that: "the buy case and timing have shifted dramatically." Further, the report emphasized that the "synergy upside case from the [Pinnacle Foods] deal [was] now a 'fix [Pinnacle] while keeping the core in solid shape' story," that the "business is in far greater need of repair than anticipated," and that Pinnacle's shortfall issues including subpar innovation, weak productivity, subpar SKU proliferation and low ROI trade spend could have been "ascertained beforehand given [Conagra] and [Pinnacle]'s overlapping categories."

(k) On January 23, 2019, UBS published a note from meetings with Conagra's CEO, CFO and Investor Relations – stating that: "at the time of the deal, Conagra was aware of 2 issues at Pinnacle" – that were later disclosed on December 20 – the supply chain issues and lost

distribution for Wish-Bone and the SKU proliferation from 12 to 34 for Duncan Hines. UBS also stated that: "Pinnacle's root issue is a lackluster innovation, because then PF needed to rely on trade to hit targets." Consistent with the Connolly playbook to rid Pinnacle of its bad habits, UBS added that "PF sold much of its 2019 plan to retailers that Conagra has subsequently scrapped." UBS concluded that the "[m]argin miss came down to weakening of brands and innovation slate."

161. Following Conagra's disclosure of declining sales and margins at Pinnacle, on December 20, 2018, Conagra's stock price fell $4.81 per share to $24.28 per share, or nearly 17%, wiping out over $2.3 billion in Conagra's market capitalization. On the next trading day, Conagra's stock price declined an additional $2.13 per share, or 8.8%. For the three trading sessions following this announcement, Conagra stock price declined $8.13 per share, or 30%, to close at $20.96 per share on December 24, 2018. This decline was approximately five times that experienced by the market index.

162. On June 27, 2019 Conagra filed a Form 8-K with the SEC reporting its latest quarterly results. Connolly and Marberger also held a quarterly earnings conference call with investors and made the following admissions:

> ***As expected, the implementation of our value-over-volume approach resulted in short-term sale declines as we pruned the low-performing SKUs to clear the decks for our new innovations***.
>
> * * *
>
> The Pinnacle acquisition reduced total company adjusted EPS by $0.07 during the quarter.
>
> * * *
>
> ***The Pinnacle acquisition reduced total company adjusted EPS by $0.14 for fiscal 2019***.
>
> * * *
>
> Finally, ***we expect Pinnacle will continue to be dilutive to our year-over-year gross margin until we anniversary the acquisition in late October***.

* * *

> And then on Pinnacle, in particular, as we've talked before, ***getting those TPDs back that were lost last year***, that should really start to kick in as we get to the middle part of the year and the back half of the year.

* * *

> ***We also are in the midst of doing some value-over-volume in particular on the Pinnacle business as we clear the decks for our new innovation***. So in terms of the year, what we said before is that we expect the trend to bend as we move from the first half into the second half, without giving kind of quarter-to-quarter, month-to-month specificity on the slopes of those curves. I think we'd leave it at that in part because as we've said many times, with respect to the Pinnacle TPDs, we are trying to accelerate, where possible, getting some of these new innovations into the marketplace ahead of a normal planogram cadence. And that work, as it has been going on, continues, especially when we get in some customers, some of these new innovations in there and can demonstrate that they're working and we've got traction.

Following this disclosure Conagra common stock declined over 12% on June 27, 2019 as compared to a slight increase in the S&P 500 market index.

163. Like other members of the Class of purchasers of Conagra securities (defined herein), who purchased at artificially inflated prices during the Class Period, Plaintiffs suffered an economic loss, *i.e.*, damages, when Conagra's securities prices declined upon the disclosures correcting the alleged misrepresentations.

164. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Conagra's business and prospects. When the truth about the Company was revealed to the market, the price of Conagra common stock fell precipitously.

165. These declines removed the inflation from the price of Conagra common stock, causing real economic loss to investors who had purchased Conagra common stock during the Class Period. The declines in the price of Conagra common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.

166. The timing and magnitude of Conagra's securities price decline negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme and misrepresentations to artificially inflate Conagra's securities price and the subsequent significant decline in the value of Conagra securities when the true state of the Company's operations was revealed to the market correcting the misrepresentations and/or the economic impact thereof.

## CLASS ACTION ALLEGATIONS

167. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Conagra securities from June 27, 2018 through December 19, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

168. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Conagra securities were extensively traded on the NYSE. As of February 24, 2019 there were 485,914,676 million ordinary shares of Conagra common stock outstanding. The exact number of class members can be determined only by appropriate discovery, but Plaintiffs believe that there are likely thousands of class members that are geographically dispersed, if not more. Record owners and other members of the Class may be identified from the books and records maintained by Conagra or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using

techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

169. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

170. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the class members' damages arise from and were caused by the misleading statements and/or omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

171. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

172. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants' publicly disseminated statements to the investing public during the Class Period misstated and/or omitted material facts;

(c) whether Defendants failed to convey material facts;

(d) whether Defendants acted knowingly or with severe recklessness in misstating and/or omitting material facts;

(e) whether the price of Conagra common stock was artificially inflated during the Class Period; and

(f) whether members of the Class have sustained damages, and, if so, the appropriate measure of damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

173. The Class Period inflation in the price of Conagra common stock was eliminated when the financial conditions, business risks and other information concealed by Defendants' fraud was revealed to the market.

174. At all relevant times, the market for Conagra common stock was an efficient market for the following reasons, among others:

(a) Conagra securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) during the Class Period, a high weekly volume of Conagra common stock traded on the NYSE;

(c) as a regulated issuer, Conagra filed periodic public reports with the SEC and NYSE;

(d) throughout the Class Period, over a dozen different firms and dozens of analysts covered Conagra common stock;

(e) throughout the Class Period, Conagra was eligible to file an SEC Registration Form S-3;

(f) Conagra regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(g) unexpected material news about Conagra was rapidly reflected in and incorporated into its stock price.

175. As a result of the foregoing, the market for Conagra common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Conagra securities. Under these circumstances, all purchasers of Conagra common stock during the Class Period suffered similar injury when the revelation of Defendants' scheme removed the artificial inflation that had been part of the price they paid when they purchased Conagra securities.

176. A class-wide presumption of reliance is appropriate in this action because the Class's claims are grounded on Defendants' material misstatements and omissions. Because Defendants misrepresented and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, positive proof of reliance is not required. All that is necessary is that the facts misrepresented and/or omitted be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period misstatements and/or omissions set forth above, that requirement is satisfied here.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10(b)-5**
**Against Conagra and the Executive Defendants**

177. Plaintiffs incorporate ¶¶1-176 by reference.

178. During the Class Period, Conagra and the Executive Defendants disseminated or approved the statements as specified above, which they knew or recklessly disregarded, misstated

and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

179. Conagra and the Executive Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) misstated and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchase of Conagra common stock during the Class Period.

180. Conagra and the Executive Defendants, individually and together, directly or indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Conagra's business and operations as specified herein.

181. Conagra and the Executive Defendants had actual knowledge of the misrepresentations and/or omitted material facts set forth herein, or recklessly disregarded the misleading and/or omitted material facts that were available to them.

182. As a result of the dissemination of the misleading information and failure to disclose material facts, as set forth above, the market price of Conagra common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Conagra common stock was artificially inflated, Plaintiffs and other members of the Class purchased or otherwise acquired Conagra common stock during the Class Period at artificially high prices and were damaged thereby.

183. Plaintiffs and the Class paid artificially inflated prices for Conagra common stock, and suffered losses when the relevant facts were revealed. Plaintiffs and the Class would not have purchased or otherwise acquired Conagra common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

184. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their Class Period transactions in Conagra common stock.

185. By reason of the foregoing, Defendants named in this Count have violated §10(b) of the Exchange Act and SEC Rule 10b-5

**COUNT II**
**Violation of §20(a) of the Exchange Act**
**Against Conagra and the Executive Defendants**

186. Plaintiffs incorporate ¶¶1-185 by reference.

187. The Executive Defendants were controlling persons of Conagra within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions as officers and/or directors of the Company, their ownership and contractual rights, participation in and awareness of the Companies' operations and intimate knowledge of the statements filed by Conagra with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

188. In particular, each of these Defendants had direct or supervisory responsibility over the day-to-day operations of the Company, and therefore, are presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

189. Conagra controlled the Executive Defendants, and is a controlling person of those Defendants within the meaning of §20(a) of the Exchange Act.

190. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Conagra common stock during the Class Period when the relevant truth was revealed.

191. By reason of the foregoing, the Defendants named in this Count violated §20(a) of the Exchange Act.

**COUNT III**
**Violation of §11 of the Securities Act**
**Against All Defendants**

192. This claim is brought against all Defendants.

193. This claim does not sound in fraud. For the purposes of this §11 claim, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under §11 of the Securities Act. Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §11 claim.

194. This claim is brought against all Defendants pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class who purchased or otherwise acquired Conagra's common stock in or traceable to the SPO, and were damaged thereby.

195. At the time of the SPO, the Offering Documents contained untrue statements of material fact, omitted to state facts necessary to make the statements therein not misleading and/or failed to disclose required material information as alleged above.

196. Conagra is the registrant for the SPO. As issuer of the common stock, Conagra is strictly liable to City of Taylor, City of Sarasota and other members of the Class who purchased

common stock in or traceable to the SPO for the materially false or misleading statements in or material omissions from the Offering Documents.

197. The Defendants named herein were responsible for the contents and dissemination of the Offering Documents. The Executive and Director Defendants were signatories of the false or misleading Registration Statement. The Underwriter Defendants were underwriters of the SPO. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

198. The City of Taylor, City of Sarasota and other members of the Class acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO.

199. The City of Taylor, City of Sarasota and other members of the Class have sustained damages. The value of Conagra common stock has declined substantially subsequent to the SPO as a result of Defendants' violations.

200. By reason of the conduct herein alleged, the Defendants named in this Count have violated §11 of the Securities Act.

**COUNT IV**
**Violation of §12(a)(2) of the Securities Act**
**Against All Defendants**

201. This claim is asserted against all Defendants.

202. This claim does not sound in fraud. For the purposes of this §12(a)(2) claim, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under §12(a)(2) of the Securities Act. Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §12(a)(2) claim.

203. This claim is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all persons or entities who purchased Conagra common stock issued

pursuant or traceable to the SPO. Defendants were sellers, offerors and/or solicitors of purchasers of the shares offered pursuant to the Offering Documents.

204. The Offering Documents contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above. Defendants owed Plaintiffs and the other members of the Class who purchased Conagra shares of common stock, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents as set forth above.

205. The City of Taylor, City of Sarasota and other members of the Class purchased or otherwise acquired Conagra's common stock pursuant to and/or traceable to the defective Offering Documents. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

206. Members of the Class who purchased the common stock pursuant to the Offering Documents and still hold that common stock have sustained substantial damages as a result of the untrue statements of material facts and omissions contained therein, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this claim for relief in return for the consideration paid with interest. Those members of the Class who have already sold their common stock acquired in the SPO pursuant to the materially untrue and misleading Offering Documents are entitled to damages from the Defendants.

207. By reason of the conduct herein alleged, the Defendants have violated §12(a)(2) of the Securities Act.

## COUNT V
## Violation of §15 of the Securities Act
## Against the Executive and Director Defendants

208. This claim is asserted against the Executive and Director Defendants.

209. This claim does not sound in fraud. For the purposes of this §15 claim, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under §15 of the Securities Act. This claim is based solely on strict liability. Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this §15 claim.

210. This claim is asserted against the Executive and Director Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Securities Act Class who purchased or otherwise acquired Conagra common stock issued pursuant or traceable to the Offering Documents.

211. At all relevant times, these Defendants were control persons of Conagra by virtue of his or her position as an owner, director and/or senior officer of Conagra. These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Conagra. By reason of their positions within the Company and/or their stock ownership and/or because of their positions on Conagra's Board of Directors, the Executive and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Counts III and IV.

212. Defendants Connolly and Marberger and the other Director Defendants, prior to and at the time of the SPO, participated in the operation and management of the Company, and conducted and participated, directly or indirectly, in the conduct of Conagra's business affairs, including the SPO.

213. As officers and/or directors of a company engaging in an SPO, the Executive and Director Defendants had a duty to disseminate accurate and truthful information with respect to Conagra's business. These Defendants participated in the preparation and dissemination of the offering documents, and otherwise participated in the process necessary to conduct the SPO. Because of their positions of control and authority as senior officers and/or directors of Conagra, these Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information and failed to disclose material facts.

214. By reason of the aforementioned conduct, the Executive and Director Defendants are liable under §15 of the Securities Act jointly and severally with and to the same extent as Conagra is liable under §§11 and 12(a)(2) of the Securities Act, to Plaintiffs and members of the Securities Act Class who purchased or otherwise acquired common stock issued pursuant to the Offering Documents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and such equitable/injunctive or other relief as deemed appropriate by the Court.

# EXHIBIT 1

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Warren Police and Fire Ret. System v. Zebra Technologies Corp.*, No. 2:17-cv-04412 (E.D.N.Y.)
*In re Unum Group Sec. Litig.*, No. 1:18-cv-00128 (E.D. Tenn.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of June, 2019.

CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM

By: ______________________

Its: Trustee/Chairman

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/01/2018 | 251 | $33.19 |
| 10/10/2018 | 19 | $35.25 |
| 10/10/2018 | 719 | $35.77 |
| 10/11/2018 | 143 | $35.40 |
| 10/11/2018 | 218 | $35.35 |
| 10/12/2018 | 53 | $35.21 |
| 10/12/2018 | 231 | $35.06 |
| 10/15/2018 | 20 | $35.58 |
| 10/15/2018 | 21 | $35.80 |
| 10/26/2018 | 358 | $35.51 |
| 10/29/2018 | 174 | $36.07 |
| 10/30/2018 | 168 | $36.29 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 11/14/2018 | 75 | $33.76 |
| 12/19/2018 | 5 | $29.05 |

# EXHIBIT 2

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF SARASOTA POLICE OFFICERS' PENSION PLAN ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of June, 2019.

CITY OF SARASOTA POLICE OFFICERS' PENSION PLAN

By: ______________________
Ron Baty, Chairman

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/27/2018 | 1,214 | $35.64 |
| 07/20/2018 | 649 | $36.09 |
| 10/10/2018 | 1,472 | $35.25 |
| 11/14/2018 | 551 | $33.10 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/13/2018 | 237 | $37.85 |
| 09/27/2018 | 127 | $32.94 |
| 11/07/2018 | 471 | $34.73 |
| 11/12/2018 | 445 | $35.20 |

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: July 1, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
SCOTT H. SAHAM
TING H. LIU

s/ Scott H Saham
SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
scotts@rgrdlaw.com
tliu@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

Lead Counsel for Plaintiffs and the Class

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC 20015
Telephone: 202/362-0041
202/362-2640 (fax)

Additional Counsel for Lead Plaintiff

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Plaintiff City of Taylor

CHRISTIANSEN & DEHNER, P.A.
SCOTT CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL 34240
Telephone: 941/377-2200
941/377-4848 (fax)
scott@cdpension.com

Additional Counsel for Plaintiff City of Sarasota

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 1, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Scott H. Saham
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: ScottS@rgrdlaw.com

Case: 1:19-cv-01323 Document #: 68 Filed: 07/01/19 Page 68 of 69 PageID #:839

# Mailing Information for a Case 1:19-cv-01323 West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Spencer A Burkholz**
  spenceb@rgrdlaw.com
- **Theodore Thomas Chung**
  ttchung@jonesday.com
- **Marjorie Patricia Duffy**
  mpduffy@jonesday.com,rfargabrite@jonesday.com,pgarver@jonesday.com,dkoenig@jonesday.com
- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com
- **J. Alexander Hood , II**
  ahood@pomlaw.com
- **Lester R Hooker**
  lhooker@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com
- **Jeffrey John Huelskamp**
  jhuelskamp@winston.com,jeffrey-huelskamp-1688@ecf.pacerpro.com
- **Andrew W. Hutton**
  DHutton@rgrdlaw.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Ting Liu**
  TLiu@rgrdlaw.com
- **Francis P. Mcconville**
  fmcconville@labaton.com,kgutierrez@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com
- **Joseph Laurence Motto**
  jmotto@winston.com,joe-motto-4498@ecf.pacerpro.com
- **Frank Anthony Richter**
  frichter@rgrdlaw.com
- **Geoffrey J. Ritts**
  gjritts@JonesDay.com
- **Steven B Singer**
  ssinger@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com
- **Robert Y. Sperling**
  rsperling@winston.com,bob-sperling-5356@ecf.pacerpro.com,ECF_CH@winston.com
- **Michael James Stern**
  mjstern@winston.com,michael-stern-4446@ecf.pacerpro.com
- **Joseph E. White , III**
  jwhite@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Scott H Saham**
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101