## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, <br><br> Plaintiff, <br><br> v. <br><br> CONAGRA BRANDS, INC. et al., <br><br> Defendants. | Case No. 19-cv-01323 <br><br> Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

In 2018, Conagra Brands, Inc. acquired Pinnacle Foods. To fund the merger, Conagra held a secondary public offering ("SPO"). After the merger was complete, Conagra reported disappointing financial results and Conagra's stock fell. Plaintiffs National Elevator Industry Pension Fund, City of Taylor Police and Fire Retirement System, and City of Sarasota Police Officers' Pension Plan sued Defendants Conagra, Sean Connolly (Conagra's CEO), David Marberger (Conagra's CFO), a slate of Conagra directors, and the underwriters to the SPO, alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants move to dismiss. [75]. For the reasons below, the motion is granted.

### Background

For purposes of Defendants' motion to dismiss, the court accepts as true the well-pleaded factual allegations of the consolidated class action complaint and draws all reasonable inferences in Plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The court also considers the documents attached to the complaint, documents that are critical to the complaint and referred to in it, information that is subject to proper judicial notice, and additional facts set forth in Plaintiffs' opposition to the motion to dismiss, to the extent those facts are consistent with the pleadings. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)); *Larkin v. Bd. of Educ. of City of Chicago*, No. 17-cv-09298, 2020 WL 1904087, at *1–2 (N.D. Ill. Apr. 17, 2020).

## I.      The Merger

This case concerns a merger between Conagra and Pinnacle, both food companies with large portfolios of well-known brands.  [68] ¶¶ 2–3.[1]  Defendant Sean Connolly has been Conagra's CEO since April 2015.  [68] ¶¶ 5, 37.  Defendant David Marberger has been Conagra's Executive Vice President and CFO since August 2016.  [68] ¶ 38.

In 2014, while CEO of Hillshire Brands, Inc., Connolly executed an agreement to merge Pinnacle with Hillshire.  [68] ¶ 124.  Ultimately, Tyson Foods ended up acquiring Hillshire, and Pinnacle stayed independent.  [68] ¶ 124.

As CEO of Conagra, Connolly again approached Pinnacle about a potential acquisition.  [68] ¶ 136.  In March 2017, he proposed a deal that Pinnacle rejected.  [68] ¶¶ 137–38.  Conagra's board continued to study Pinnacle, including devoting two days in December 2017 to the topic, and authorized Connolly to reengage Pinnacle.  [68] ¶ 138.  In January 2018, Pinnacle inquired about a supply chain partnership with Conagra.  On April 17, Connolly rejected that proposal, but again expressed interest in an acquisition.  [68] ¶ 139.  On April 19, a Conagra investor called JANA announced a 9.5% stake in Pinnacle and expressed its interest in Pinnacle's sale.  [68] ¶ 140.  In May, Conagra made another offer to buy Pinnacle.  [68] ¶ 141.

On June 26, 2018, the deal was finalized: Conagra would buy 100% of Pinnacle's outstanding equity for $68.00 per share, paid in cash and Conagra common stock.  [68] ¶ 141.  The following day, June 27, 2018, Conagra announced the proposed merger.  [68] ¶ 3.  The deal was valued at around $10.9 billion.  [68] ¶ 3.

Conagra conducted due diligence on Pinnacle "as part of the acquisition."  [68] ¶ 124.  Defendants received access to an electronic data room that among other things contained a copy of the "2018 Modified Management Case for fiscal years 2018 through 2020."  [68] ¶ 124.

On October 10, 2018, Conagra commenced an SPO and sold 16.3 million shares of Conagra common stock for a total of $575 million.  [68] ¶ 15.  The SPO served in part to finance the Pinnacle merger.  [68] ¶ 15.

The deal closed on or about October 26, 2018.  [68] ¶ 122.

---

[1] Bracketed numbers refer to docket entries and are followed by the page and / or paragraph number.  Page numbers refer to the ECF page number.

## II.     The Challenged Statements

Plaintiffs allege that before the SPO and merger, Defendants made the following series of false or misleading statements about Pinnacle.

On June 27, 2018, the day the deal was announced, Defendants filed a Form 8-K with the SEC that disclosed Conagra board approval of the Pinnacle acquisition. [68] ¶ 60. Both the form and an accompanying press release stated: "The combination of two growing portfolios of iconic brands will serve as a catalyst to accelerate value creation for shareholders." [68] ¶¶ 60, 100, 101. The press release also described Conagra and Pinnacle as "two of the fastest-growing companies in the consumer packaged foods industry by consumption." [68] ¶ 99.

During a conference call that day, Defendants predicted a "seamless integration of Pinnacle," and a "+" impact on adjusted gross margin. [68] ¶¶ 61, 111. They also represented that Pinnacle's "full year 2017 net sales were $3.1 billion," which was a year-over-year (YOY) increase of $17 million. [68] ¶ 62. They continued: "We expect top line growth to continue at the pace both companies have delivered, but by combining 2 very strong portfolios, the sustainability of that growth is enhanced. And with the addition of Pinnacle, we expect an improved margin profile and EPS [earnings per share] accretion versus the Conagra base business." [68] ¶ 63. Connolly anticipated a "smooth integration process." [68] ¶¶ 104, 110.

On September 4, Connolly described Pinnacle's Birds Eye brand as "an absolutely terrific business." [68] ¶ 114. More generally, he commented that the merger was "as much of a no-brainer of a deal as I think you're going to see," and noted that Conagra liked "the growth prospects in frozen." [68] ¶ 114. On September 21, Conagra filed a Form 425 with an attachment that again referenced Pinnacle's "growing portfolios of iconic brands." [68] ¶ 117.

The Offering Documents for the SPO (which as noted above commenced on October 10, 2018) said that the merger would combine "two of the fastest-growing companies in the consumer packaged foods industry by consumption," and reported that Pinnacle's net sales had grown in 2017 and the first half of 2018. [68] ¶ 64. Specifically, Pinnacle's net sales in 2017 totaled $3.144 billion ($17 million more than in 2016), and as of July 1, 2018, Pinnacle's net sales in 2018 totaled $1.52 billion ($10 million more than that period in 2017). [68] ¶ 65. The Offering Documents also represented that with respect to Pinnacle's 2018 third quarter (3Q18) results, declines in the grocery segment were "offset by ongoing growth in Pinnacle's Frozen segment, led by the Birds Eye franchise, which continued to drive Pinnacle's robust innovation program." [68] ¶ 97.

### III.    Post-Merger Developments

As noted above, the deal closed on or about October 26, 2018.  [68] ¶ 122.  On December 20, Conagra reported its quarterly results and disclosed that Pinnacle's 2018 sales were $160 million below Pinnacle's target.  [68] ¶ 155.  According to Connolly, $30 million of that difference was driven by Conagra's "postclose decisions to exit some year-end promotions that we saw as extremely low ROI."  [68] ¶¶ 72, 155.  In Connolly's view, Pinnacle had used promotions "to jump-start volume" using "low ROI trade," which he believed was "chasing volume over value."  [68] ¶¶ 70, 78.  Marberger stated that Pinnacle's promotions continued through the second half of 2018.  [68] ¶ 70.  He further explained: "given the volume declines that Sean's discussed on the big 3,[2] Pinnacle attempted to add price promotions on the second half to make up for the volume.  These were not efficient programs and resulted in additional price erosion."  [68] ¶ 158.  Additionally, Connolly expressed his belief that Pinnacle's "innovation was insufficient to sustain growth, primarily because it was subpar in its execution."  [68] ¶ 157.

From December 20 to December 24, Conagra's stock price fell from $29.09 to $20.96.  [68] ¶ 161.  On June 27, 2019, Connolly and Marberger held a quarterly earnings call and said, among other things: "As expected, the implementation of our value-over-volume approach resulted in short-term sales declines as we pruned the low-performing SKUs to clear the decks for our new innovations. . . .  We also are in the midst of doing some value-over-volume in particular on the Pinnacle business as we clear the decks for our new innovation."  [68] ¶ 162.  That day, Conagra's stock fell by over 12%.  [68] ¶ 162.

In early 2019, a variety of Conagra investors sued Defendants.  Those cases were consolidated into this action, [59], and lead plaintiff National Elevator Industry Pension Fund filed this consolidated class action complaint, [68].  Plaintiffs allege that Conagra, Connolly, and Marberger violated §§ 10(b) and 20(a) of the Exchange Act (Counts 1 & 2).  They also allege that in connection with the SPO: (1) all Defendants violated §§ 11 and 12(a)(2) of the Securities Act (Counts 3 & 4), and (2) Connolly, Marberger, and Conagra's directors and corporate controller violated § 15 of the Securities Act (Count 5).

Defendants move to dismiss all counts.  On June 25, 2020, the court heard oral argument on the motion.  [120].

---

[2] The complaint alleges that Pinnacle's "Big 3" brands were Birds Eye, Duncan Hines, and Wish-Bone.  [68] ¶ 79.

## Discussion

To survive a 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the claimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiffs. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). On the other hand, "[t]he complaint must do more than recite the elements of a cause of action in a conclusory fashion." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678).

Additionally, the heightened pleading requirements in Rule 9(b) apply to allegations of fraud. Plaintiffs "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That includes the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)). Each instance of fraud must be alleged with "precision and some measure of substantiation." *Menzies*, 943 F.3d at 738 (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)).

The Private Securities Litigation Reform Act (PSLRA) imposes further pleading requirements on Exchange Act claims. A securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u–4(b)(1), and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u–4(b)(2)(A); *see Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598–99 (7th Cir. 2019).[3]

## I.    Primary Liability Claims

The bulk of the parties' disputes concern Plaintiffs' claims under Section 10(b) of the Exchange Act (Count 1) and Sections 11 and 12(a)(2) of the Securities

---

[3] 15 U.S.C. § 78u–4(b)(1) specifies that the PSLRA's heightened pleading standard applies to private actions arising "under this chapter," that is, the Exchange Act. Accordingly, "[t]he heightened pleading standard of the PSLRA does not apply to claims under the Securities Act." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-cv-10320, 2020 WL 1529371, at *11 (S.D.N.Y. Mar. 30, 2020) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

Act (Counts 3 & 4).[4]  The parties do not dispute that Plaintiffs' remaining claims depend on a violation of one of these "primary liability" provisions.[5]

Section 10(b) of the Exchange Act prohibits (1) the "use or employ[ment] . . . of any . . . manipulative or deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements § 10(b) by making the following actions unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen*, 916 F.3d at 598; *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 414 (7th Cir. 2015).

Plaintiffs also allege violations of Sections 11 and 12(a)(2) of the Securities Act.  Section 11 creates a private remedy for securities purchasers if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 12 creates a similar cause of action for misstatements or omissions in a prospectus.  15 U.S.C. § 77l(a)(2).  These provisions protect investors by "ensuring that companies issuing securities (known as 'issuers') make a full and fair disclosure of information relevant to a public

---

[4] Both parties primarily rely on Exchange Act cases throughout their briefs, and at oral argument Plaintiffs stated: "the main focus of this case obviously . . . is the '34 Act."  [120] at 51.  The court likewise focuses on the Exchange Act while addressing the overlapping claims, and notes differences where appropriate.

[5] *See, e.g.*, *Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) ("We can limit our discussion to section 10(b) and Rule 10b-5, because a violation of those provisions is necessary to support a violation of section 20(a).") (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)).

offering." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) (internal quotations and citation omitted). For both Securities Act claims, "[s]cienter is not required." *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1192 (N.D. Ill. 2009).

### A.    Rule 9(b)

As a threshold matter, Rule 9(b) applies to most of Plaintiffs' primary liability claims. "As a general matter, § 10b–5 claims sound in fraud and are therefore subject to the heightened pleading requirements of Rule 9(b)." *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1051 (N.D. Ill. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) ("*Tellabs II*")). Generally, the same is not true of Sections 11 and 12(a)(2) claims since scienter is not a required element. However, Defendants argue that the allegations underlying the Section 11 and 12 claims in this case sound in fraud and therefore Rule 9(b) applies to these claims as well.

Several circuits addressing the issue have held that when plaintiffs chose to allege fraud as a basis for a Securities Act claim, the requirements of Rule 9(b) apply. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) ("As almost every circuit court to examine the issue has held, Rule 9(b) applies to allegations under the Securities Act where those allegations sound in fraud."); *but see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314–15, 318–19 (8th Cir. 1997).

The Seventh Circuit applied Rule 9(b) to Securities Act claims in *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990). *Sears* did not expressly hold "that Rule 9(b) applies to §§ 11 and 12 claims even if those claims 'sound in fraud.'" *Ulta*, 604 F. Supp. 2d at 1193; *Evergreen Fund, Ltd. v. McCoy*, No. 00-cv-00767, 2000 WL 1693963, at *5 (N.D. Ill. Nov. 6, 2000). Accordingly, some courts in this district have declined to follow the majority approach. *See Ulta*, 604 F. Supp. 2d at 1193. More generally though, the Seventh Circuit has stated: "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *Rombach*, 355 F.3d at 170–71, and *Sears*, 912 F.2d at 893)). Plaintiffs have not provided an adequate basis for an exception where a plaintiff alleges fraud in support of a Securities Act claim. To the extent Plaintiffs' Securities Act claims sound in fraud, Rule 9(b) applies.

Plaintiffs also contend that even if Rule 9(b) applies to Securities Act claims that sound in fraud, their claims do not. The complaint disclaims "any allegation of

fraud as to the Securities Act claims." [68] ¶ 28; *see also* [68] ¶¶ 193, 197, 202, 204. Instead, Plaintiffs seek to bring claims "based on strict liability and negligence arising out of Defendants' failure to make reasonable investigation into the bases for offering document statements." [80] at 58.

However, courts generally look beyond such disclaimers to determine whether a Securities Act claim sounds in fraud. The Second Circuit has held that Rule 9(b) applies where plaintiffs make "little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint," even where they "disavow" the "allegations that would make Rule 9(b) applicable." *Rombach*, 355 F.3d at 172 (citing *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000)). Other circuits take the same approach. The Ninth Circuit engages in a "close examination of the language and structure of the complaint" to determine "whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." *In re Rigel*, 697 F.3d at 885 (internal quotations and citations omitted). It is up to the plaintiffs whether to allege "some fraudulent and some non-fraudulent conduct." *Id.* at 886. Where a Securities Act claim "merely relies on the same alleged misrepresentations . . . that are central to [the] section 10(b) fraud claim," that claim is likewise grounded in fraud. *Id.* Likewise for the Fifth Circuit. *See Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994) (Rule 9(b) applies to Securities Act claim where the complaint adopts "wholesale" the "allegations under the securities fraud claims for purposes of the Securities Act claims").

Here, at least with respect to Conagra, Connolly, and Marberger, Plaintiffs are alleging a unified course of fraudulent conduct. The Securities Act claim "does not allege different misrepresentations," *Rigel*, 697 F.3d at 886, since Plaintiffs rely on the alleged misrepresentations in the SPO Offering Documents for the Exchange Act claims as well. Moreover, all the challenged statements—the statements in the SPO Offering Documents and the statements not in the SPO Offering Documents— are allegedly false or misleading for the same reasons. *See* [68] ¶¶ 128, 195–197.

Taken together, the allegations in the complaint allege that Conagra, Connolly, and Marberger knew or were reckless with respect to the falsity of the challenged statements in the SPO Offering Documents. The Securities Act claims against them therefore sound in fraud. The cases Plaintiffs cite to the contrary did not involve similar overlap with Exchange Act claims. *See Levitan v. McCoy*, No. 00-cv-05096, 2001 WL 1117279, at *4 (N.D. Ill. Sept. 21, 2001) ("The plaintiff does not allege nor even suggest that the defendants intended to deceive First Commerce stockholders or acted with scienter in drafting the Registration Statement."); *Evergreen Fund, Ltd. v. McCoy*, No. 00-cv-00767, 2000 WL 1693963, at *5 (N.D. Ill. Nov. 6, 2000) ("The TILA violations, the only allegations in the Complaint which allege fraud, merely form the background for the plaintiffs' allegations."). Plaintiffs

allege a unified course of fraudulent conduct, so their allegations must satisfy Rule 9(b).

On the other hand, the claims against the Director Defendants and Underwriter Defendants do not necessarily sound in fraud.  Since these defendants are not named in the Exchange Act claims, the complaint does not allege a unified course of fraudulent conduct against them in the same way that it does against Conagra, Connolly, and Marberger.  *See, e.g.*, *Rombach*, 355 F.3d at 178 (affirming finding that Section 11 claims against company defendants were subject to Rule 9(b) while Section 11 claims against IPO underwriters were not subject to the heightened pleading requirements of Rule 9(b) because only the former claims sounded in fraud); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) ("Plaintiffs charge the Underwriter Defendants with failing to meet their due diligence duties. . . .  Nowhere do plaintiffs allege that [the underwriters] were involved in a fraudulent scheme.  Thus, Rule 9(b) does not apply to the claims against the Underwriter Defendants.").  Reading the complaint as a whole, Plaintiffs allege that these defendants were merely negligent.

One final note: as discussed further below, Plaintiffs allege that certain statements were false because Pinnacle engaged in fraudulent channel stuffing.  In other words, there are two alleged layers of fraud in some of the Exchange Act allegations: Plaintiffs argue that, one, Pinnacle engaged in fraudulent channel stuffing and, two, Defendants' failure to disclose Pinnacle's fraudulent channel stuffing was itself fraudulent.  But the court does not decide here whether Rule 9(b)'s heightened pleading standard separately applies to the nested allegations about Pinnacle's channel stuffing (i.e. the alleged accounting fraud as opposed to the alleged securities fraud).  As discussed below, Plaintiffs' allegations do not plausibly suggest Pinnacle engaged in fraudulent channel stuffing under either standard.

To recap, Rule 9(b) applies to the Exchange Act claims as well as the Securities Act claims against Conagra, Connolly, and Marberger.  For these claims to survive, Plaintiffs must allege fraud with "precision and some measure of substantiation."  *Menzies*, 943 F.3d at 338.

### B.   Misrepresentations or Omissions

With the principles above in mind, the court turns to Defendants' arguments for dismissal.  The court begins by addressing whether Plaintiffs have adequately alleged that Defendants made false or misleading statements.

Sections 11 and 12(a)(2) of the Securities Act and Rule 10b-5 (promulgated under the Exchange Act) all prohibit untrue statements of material fact and omissions of material fact necessary to ensure a statement is not misleading.  *See* 15 U.S.C. §§ 77k(a), 77l(a)(2); 17 C.F.R. § 240.10b-5(b); *City of Omaha, Neb. Civilian*

*Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67–68 (2d Cir. 2012) (noting that claims under Sections 11 and 12 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act "all share a material misstatement or omission element"). For all of these claims, Defendants must have "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995).

Defendants argue Plaintiffs have failed to allege that they made any statements that were false or misleading because of omitted facts. The complaint alleges that Conagra, Connolly, and Marberger made a series of false or misleading statements regarding Pinnacle's financial performance before the merger. The allegations underlying the Securities Act claims—the statements made in connection with the SPO—form a subset of the larger set of allegations supporting the Exchange Act claim. The court turns to whether all the challenged statements were false or misleading.

At the pleading stage, the relevant question for deciding whether a statement is misleading is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*") (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)), *rev'd on other grounds by Tellabs II*, 551 U.S. 308; *see also Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (noting that "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation"). For the allegations supporting the Exchange Act claim, the PSLRA further requires that the complaint specify each allegedly misleading statement, the reasons why it is misleading, and, if based on information and belief, what specific facts support that information and belief. *See* 15 U.S.C. § 78u–4(b)(1). Plaintiffs must "support with particularity . . . the falsity of the statement of fact or the omission." *Tellabs I*, 437 F.3d at 595.

Broadly speaking, the challenged statements fall into two categories: (1) statements about Pinnacle's historical and present sales, performance, and growth rates, and (2) statements about the merger prospects, the anticipated ease of integration, and the merger's likely effect on Conagra.

In the first category, Plaintiffs allege that the following were misstatements: references to Pinnacle's "growing portfolio," [68] ¶¶ 60, 100, 101, 103, 105, 117, the "industry-leading growth" of Pinnacle's portfolio, [68] ¶ 109, and the "top line growth" Pinnacle had "delivered," [68] ¶ 63; representations that Pinnacle's full year net sales were $3.1 billion in 2017, [68] ¶ 62, 100, 112, Pinnacle's net sales grew in 2017 and the first half of 2018, [68] ¶ 64, 65, Pinnacle had an uninterrupted trend of YOY net sales growth from 2015-2017, [68] ¶ 65, Pinnacle delivered "solid

top line results over time," [68] ¶ 112, and 3Q18 declines in Pinnacle's Grocery segment were "partially offset by ongoing growth in Pinnacle's Frozen segment, led by the Birds Eye franchise," [68] ¶ 97; and descriptions of Pinnacle as one of "the fastest-growing companies in the consumer packaged foods industry by consumption," [68] ¶ 64, and a "leader in innovation," [68] ¶ 112.

In the second category, Plaintiffs allege that Defendants made misstatements when they stated: (1) the merger would "serve as a catalyst to accelerate value creation for shareholders," [68] ¶ 60, 100, 101, 105, 109; (2) integration of Pinnacle would be "seamless," [68] ¶ 61, and "smooth," [68] ¶ 104, 107, 110; (3) the merger would result in synergies, [68] ¶¶ 99, 106; (4) the "Impact of Transaction" on "Organic Net Sales Growth" was "=" and the "Impact of Transaction" on "Adj. Gross Margin" was "+", [68] ¶¶ 61, 62, 111, 112; (5) the proposed merger "delivers attractive financial returns," [68] ¶ 61; (6) Defendants expected "top line growth to continue," [68] ¶ 63; (7) Pinnacle and Conagra had "complementary" portfolios, [68] ¶¶ 99, 103, 106, that "fit perfectly together," [68] ¶ 108; (8) Defendants expected "an improved margin profile and EPS accretion versus the Conagra base business," [68] ¶ 63; and (9) the merger offered "a tremendous platform to drive meaningful shareholder value," [68] ¶ 101, and a "tremendous opportunity to drive profitable growth and shareholder value," [68] ¶ 122.

Defendants advance several independent arguments why none of these statements were false or misleading. The court addresses them below.

### 1.    "Channel Stuffing"

Defendants first argue—and Plaintiffs do not contest—that a common theory of falsity underlies many of these alleged misrepresentations and material omissions. Plaintiffs' central charge is that Pinnacle engaged in a practice known as "channel stuffing" in order to artificially inflate its sales during relevant periods. Plaintiffs argue that this "channel stuffing" rendered Defendants' statements about Pinnacle before the merger false or misleading in a variety of ways. Plaintiffs do not allege that any of Defendants' statements about Pinnacle's historical sales or growth rates were false with respect to recorded sales. Rather, Plaintiffs appear to argue that sales recorded pursuant to channel stuffing should have been excluded from the calculations underlying the statements.

To state a plausible securities fraud claim based on channel stuffing allegations, Plaintiffs must adequately allege that (1) Pinnacle engaged in fraudulent channel stuffing, and (2) Defendants made misstatements or omissions about it. As discussed below, Plaintiffs' allegations do not clear the first hurdle.

Channel stuffing "refers to shipping to one's distributors more of one's product than one thinks one can sell." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs III*"). "Channel stuffing becomes a form

of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Tellabs III*, 513 F.3d at 709; *United States v. Baker*, 923 F.3d 390, 393 (5th Cir. 2019) (describing "channel stuffing" as a "fraudulent scheme" in which a coconspirator agrees to purchase products and then return them in a subsequent period). In *Tellabs I*, the Seventh Circuit concluded that the plaintiffs pleaded channel stuffing—that the defendant "flooded its downstream customers" with "unordered" products—with sufficient particularity. 437 F.3d at 598. There, the charge was supported by allegations that the defendant "had to lease extra storage space" to "accommodate the large number of returns," and the defendant's largest customer had asked the defendant to stop providing it with products it "did not request or require." *Id.* A "huge number of returns" is evidence that "the purpose of the stuffing was to conceal the disappointing demand for the product rather than to prod distributors to work harder to attract new customers." *Tellabs III*, 513 F.3d at 710.

Here, Plaintiffs claim that Pinnacle used promotional discounts to shift sales from future periods in order to artificially inflate present period sales figures. According to Plaintiffs, Pinnacle's brands "lacked innovation" and its "organic sales" were in decline. [68] ¶ 9. To "conceal this declining trend in net sales," Plaintiffs allege that Pinnacle "was favoring volume over value, stuffing its sales channel and utilizing low ROI promotions that negatively impacted gross margin." [68] ¶ 9. More precisely, Plaintiffs allege that "Pinnacle stuffed its sales channel by pushing product into distribution, favoring volume over value and offering unsustainable low ROI promotional discounts and other incentives that negatively impacted Pinnacle's gross margin and cannibalized future revenues." [68] ¶ 17. Pinnacle allegedly used "extremely low ROI promotional discounts and other incentives" to pull in sales "that would have organically occurred in subsequent periods." [68] ¶ 69.

Plaintiffs do not allege any facts about returns. Instead, Plaintiffs' theory is that Pinnacle accelerated sales so that future sales would decline as customers worked through their excess inventory. Plaintiffs argue that returns are not necessary and note that the SEC has defined channel stuffing as the "pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so." [68] ¶ 75 (quoting *In re Sunbeam Corp.*, SEC Release No. 7976, 2001 WL 616627, at *1 n.4 (May 15, 2001)). But even assuming price discounts without any possibility of return could constitute fraudulent channel stuffing, Plaintiffs must still plead facts plausibly suggesting that Pinnacle's price discounts were fraudulent attempts to overstate sales. *Tellabs III*, 513 F.3d at 709; *City of Birmingham Ret. & Relief Sys. v. A.O. Smith Corp.*, No. 19-cv-01198, 2020 WL 3452971, at *7 (E.D. Wis. June 24, 2020) (citing *Sunbeam* for the proposition that "[o]ffering volume discounts and other incentives to customers can be part of a channel-stuffing scheme," but noting that "such

practices are also legitimate and used by most companies"). The fact that Pinnacle used promotional pricing to increase sales volume is not enough. For example, Pinnacle could have used promotional pricing to push additional distribution in the hopes of jump-starting demand, or "incit[ing] distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Tellabs III*, 513 F.3d at 709; *see also City of Birmingham*, 2020 WL 3452971, at *5 ("[H]aving high channel inventory is not inherently fraudulent.").

Nor, as Plaintiffs recognize, [80] at 24, is it enough that Pinnacle attempted to move up the timing of regular sales. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course . . . ."). Plaintiffs must allege facts showing that Pinnacle shifted sales to earlier periods for an illegitimate reason. *See Tellabs I*, 437 F.3d at 598 ("While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them."); *Spectrum Brands*, 461 F. Supp. 2d at 1309 ("Plaintiffs must plead with particularity facts sufficient to allege not only that the alleged channel-stuffing occurred, but also that it was not legitimate.").

The complaint does not allege factual circumstances from which it could be inferred that Pinnacle engaged in fraudulent channel stuffing. For instance, Plaintiffs do not allege any details whatsoever about the terms of Pinnacle's "low ROI" promotions. *See Greebel*, 194 F.3d at 204 (a "complete absence" in the complaint of "such basic details as the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transactions; the dates of any of the transactions; or the identities of any of the customers or FTP [the defendant's] employees involved in the transactions" was "indicative of the excessive generality" of the allegations in that case); *Spectrum Brands*, 461 F. Supp. 2d at 1309 ("Missing here, for example, is any particular fact allegation regarding which of Spectrum Brands's clients ordered additional batteries in response to the alleged incentives, when ordered, when delivered, what quantities, and in response to which incentives.").

Nor do Plaintiffs allege any facts suggesting that Pinnacle's customers experienced an excess of inventory, let alone information contextualizing their sales and inventory levels. *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 986 (E.D. Wis. 2009) (noting that the complaint did not "set forth statistics to place the allegations of 'excess dealer inventory' in context," such as "comparisons to historical inventory levels, 'normal' inventory levels, or how the 'excess inventories' are inconsistent with the defendants' stated plans for reducing the gap between supply and demand"); *Spectrum Brands*, 461 F. Supp. 2d at 1310 (noting that the complaint did not allege "whether ShopCo had an unusually high level of existing inventory in the first place"). Plaintiffs have not provided any nonconclusory

13

allegations to show that Pinnacle's promotions created an inventory backlog for Pinnacle's customers.

Plaintiffs' factual support instead consists of (1) Defendants' post-merger statements about Pinnacle's poor 2018 financial performance, and (2) retail scanner data. Neither is sufficient.

First, Plaintiffs allege that in December 2018, Connolly said $30 million of the difference between Pinnacle's projected and actual results was driven by Conagra's "postclose decisions to exit some year-end promotions that we saw as extremely low ROI." [68] ¶¶ 72, 155. In retrospect, Connolly believed that Pinnacle used promotions "to jump-start volume" using "low ROI trade," which he believed was "chasing volume over value." [68] ¶¶ 70, 78. Marberger added: "given the volume declines that Sean's discussed on the big 3, Pinnacle attempted to add price promotions on the second half to make up for the volume. These were not efficient programs and resulted in additional price erosion." [68] ¶ 158. Plaintiffs argue that these statements amount to "admissions" that Pinnacle stuffed its channel before the merger "in a way that masked from investors the true extent of Pinnacle's declining organic sales trend." [80] at 28.

These statements cannot bear the weight Plaintiffs place on them. Taken together, they do not show that Pinnacle shipped more product to its distributors than it thought it could sell. *See Tellabs III*, 513 F.3d at 709. At most, they show Defendants believe Pinnacle made poor business decisions in the period preceding the merger. As Plaintiffs note, a Wall Street Journal article interpreted these statements as an indication that Pinnacle "pushed excess inventory to retailers prior to the deal that was difficult to sell." [68] ¶ 78. But this cannot substitute for allegations about the underlying facts. *See City of Birmingham*, 2020 WL 3452971, at *7 ("The fact that the distributor viewed the pressure as an attempt to hide declining sales does not suggest that AOS [the defendant] actually engaged in illegal channel stuffing to hide declining sales."); *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019). True, courts "routinely consider analyst reports during motions to dismiss securities fraud claims to resolve questions about the materiality of alleged misrepresentations and omissions." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 761 (N.D. Ill. 2017). But here, conclusions in external sources cannot substitute for allegations about the underlying facts. Defendants' post-merger statements do not plausibly suggest Pinnacle engaged in fraudulent channel stuffing.

As to the consumer scanner data, Plaintiffs argue that it demonstrates "the impact of Pinnacle's pulling forward of sales through unsustainable promotional discounts." [68] ¶ 79. Plaintiffs allege that the "[r]etail scanner data consists of weekly pricing, volume and store environment information generated by point-of-sale systems from more than 90 participating retail chains across all United States

14

markets." [68] ¶ 79 n.3. The complaint attaches a graph reflecting this scanner data for Pinnacle's "Big 3" brands (again, Birds Eye, Duncan Hines and Wish-Bone). 68] ¶ 79. This data appears to show, for example, that Pinnacle's "flag ship brand" Birds Eye had positive YOY sales growth in late 2017 and early 2018, but the growth rate fell to around zero by September 2018. [68] ¶ 79–80. Plaintiffs allege that this pattern resulted from "sell-ins" at "discounted/promotional prices" that "loaded up" customers with product, requiring them to "sell off this inventory in subsequent periods." [68] ¶ 80. They also allege that similar channel stuffing occurred with respect to Pinnacle's Duncan Hines and Wish-Bone brands. [68] ¶ 81. They assert that "[b]ut for sell-ins of product that was not currently needed by customers, Pinnacle would have reported declining YOY net sales for 2017 and the first 6 months of 2018." [68] ¶ 83. But the scanner data does not and could not support these speculative and hypothetical claims. Nor could the data show that the promotions constituted fraudulent channel stuffing.

Plaintiffs cite a slew of cases upholding channel stuffing claims, but none of them involved the same lack of detail that plagues Plaintiffs' claims. *See, e.g.*, *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d, 878 (D. Minn. 2011); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193 (E.D.N.Y. 2000); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001); *Sherleigh Assocs. v. Windmere-Durable Hldgs.*, 178 F. Supp. 2d 1255 (S.D. Fla. 2000); *Cunha v. Hansen Nat. Corp.*, No. 08-cv-01249, 2011 WL 8993148 (C.D. Cal. May 12, 2011); *In re Connetics Corp. Sec. Litig.*, No. 07-cv-02940, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008); *Luna v. Marvell Tech. Grp. Ltd*, No. 15-cv-05447, 2016 WL 5930655, at *1 (N.D. Cal. Oct. 12, 2016); *Murphy v. Precision Castparts Corportion*, No. 16-cv-00521, 2017 WL 3084274, at *1 (D. Or. June 27, 2017). In these cases, the plaintiffs either identified customers that received unwarranted or excess product inventory, alleged accounting violations, alleged that sales were subject to rights of return, or otherwise alleged facts suggesting a fraudulent scheme. *See, e.g.*, *Connetics*, 2008 WL 3842938, *10 (allowing claim to go forward where plaintiffs alleged that the defendants "would regularly direct employees to increase forecasts so that the Company could internally justify selling more products to distributors than a good-faith estimate of the future retail demand would permit"). Here, Plaintiffs make no such allegations and the facts they do plead do not plausibly suggest that Pinnacle engaged in fraudulent channel stuffing.

Returning to the alleged misstatements, Plaintiffs claim that Defendants' statements about Pinnacle's historical and contemporaneous growth and performance were false or misleading because of undisclosed channel stuffing. The lack of adequate allegations of fraudulent channel stuffing is fatal to the claim that Defendants' otherwise accurate statements of historical fact were false or misleading. *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) ("Accurate statements of historical fact, such as past financial results, are not

actionable."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001). Defendants' references to Pinnacle's "solid top line results over time" and past "top line growth" are not actionable.  The same is true of Defendants' representations that Pinnacle's full year net sales were $3.1 billion in 2017, that its net sales grew in 2017 and the first half of 2018, and that it had an uninterrupted trend of YOY net sales growth from 2015-2017.  None of these things would be false or misleading unless reported sales data was fraudulently overstated, and Plaintiffs do not adequately allege fraud.

Plaintiffs argue that Defendants gave investors a "false impression that organic sales were growing through 2017 and the first half of 2018."  [80] at 12.  But they do not explain why a reasonable investor would automatically assume that all net sales growth was entirely attributable to "organic" sales growth as somehow distinguished from growth driven in part by promotions.  Without fraud, there is nothing unusual or illegitimate about pricing promotions.

For the above reasons, Plaintiffs have not adequately pled that any statements about Pinnacle's past and contemporaneous growth and performance were false or misleading.  *See Gallagher*, 269 F.3d at 808 ("What sinks plaintiffs' position is their inability to identify any false statement—or for that matter any truthful statement made misleading by the omission.").

## 2.    Bad Habits and Promotions

Not all of Plaintiffs' allegations of material misrepresentations or omissions depend on fraudulent channel stuffing.

Plaintiffs also appear to argue that Defendants' failure to disclose Pinnacle's "bad habits" and promotional practices—regardless of whether those practices amounted to fraudulent channel stuffing—rendered certain statements false or misleading.  *See* [68] ¶ 18.  At oral argument, Plaintiffs relied heavily on this theory and argued it was not necessary to show any fraudulent channel stuffing by Pinnacle at all for their claim to survive.  [120] at 73.  For example, Defendants represented that the merger would have a positive impact on Conagra's adjusted gross margin, [68] ¶¶ 61, 62, 111, 112, and would yield "an improved margin profile and EPS accretion versus the Conagra base business," [68] ¶ 63, even though Pinnacle's promotions were allegedly "margin killing," [68] ¶¶ 96, 98.  Plaintiffs argue that together, Defendants' predictions that Conagra's margin profile would improve *and* that Pinnacle's "top line growth" would continue were false since Pinnacle's top line growth at that time was achieved through promotions that eroded Pinnacle's margins.  [80] at 13.  Plaintiffs premised much of their oral argument on the false or misleading nature of this combined prediction.  *See* [120] at 33–34 ("[T]his is the most false and misleading statement in the case.").

16

Similarly, Plaintiffs argue that other statements, such as references to Pinnacle's "growing" portfolio and Defendants' description of Pinnacle as one of "the fastest-growing companies in the consumer packaged foods industry by consumption," carried an implication of short-term future growth. *See Tellabs III*, 513 F.3d at 705 ("When Tellabs told the world that sales of its 5500 system were 'still going strong,' it was saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse."). If Defendants omitted material facts about Pinnacle's growth prospects, such references to Pinnacle's present and continuing growth could have been misleading.

Finally, Plaintiffs allege that Pinnacle's practices and promotions were inconsistent with Conagra's "premiumization" approach. If that was true, it could bear on Defendants' predictions of "seamless," [68] ¶ 61, and "smooth," [68] ¶ 104, 107, 110, integration, the potential for realizing synergies, [68] ¶¶ 99, 106, and statements that Pinnacle and Conagra had "complementary" portfolios, [68] ¶¶ 99, 103, 106, that "fit perfectly together," [68] ¶ 108.

However, Plaintiffs do not allege any details about the terms of Pinnacle's promotions, their timing, or the customers offered promotions by Pinnacle. Nor do they allege any facts about the unidentified promotions that could support their claim that they were "margin killing." Plaintiffs cannot allege that Defendants' predictions of improved margins were misleading merely by way of conclusory labels. For support, Plaintiffs point to Defendants' later statements indicating that post-merger, they decided some of Pinnacle's promotions were ill-advised and "low ROI." But this after-the-fact assessment does not plausibly suggest that a failure to disclose the existence of any given promotion was an omission that made any of Defendants' statements misleading at the time.

Plaintiffs also rely on the fact that in December 2018, Defendants reported Pinnacle's 2018 adjusted gross margin was roughly 230 basis points below analyst expectations. [68] ¶ 22. They appear to argue that since Pinnacle's margins ended up being lower than expected for the overall year, they must have been in decline or lower than expected at the time Defendants conducted diligence. Again, Plaintiffs do not allege any facts about Pinnacle's margins—in absolute terms, in terms of year over year improvement, or relative to internal or analyst expectations—at the time of the challenged statements. The final 2018 results do not plausibly suggest statements about Pinnacle's margins earlier in the year were misleading.

As with Plaintiffs' fraudulent channel stuffing theory, Plaintiffs' allegations about Pinnacle's "bad habits" and promotions, as well as Pinnacle's ultimate underperformance relative to expectations, are insufficient to plausibly allege that any challenged statement was false or misleading.

### 3. Growth in Pinnacle's Frozen Segment

The parties also dispute whether Defendants made a material misstatement about growth in Pinnacle's Frozen segment. Plaintiffs allege that the October 9, 2018 offering documents for the SPO stated that 3Q18 declines in Pinnacle's Grocery segment were "partially offset by ongoing growth in Pinnacle's Frozen segment, led by the Birds Eye franchise." [68] ¶ 97. Plaintiffs allege that in fact, Birds Eye sales declined by ten percent after 1Q18. [68] ¶ 98. Defendants argue that these facts are not inconsistent and that the alleged sales decline is unsupported. Even if Birds Eye sales declined after 1Q18, they could nonetheless have increased during 3Q18. Moreover, the scanner data that Plaintiffs incorporate into the complaint does not show a ten percent decline in Birds Eye sales. *See* [68] ¶ 79. Instead, it shows a decline (of roughly that amount) in the year over year *growth rate* of Birds Eye sales. [68] ¶ 79.

In the opposition brief, Plaintiffs concede that only the growth rate declined, but argue that "Birds Eye sales growth could not have offset declines in grocery sales, as it was itself declining 10% in the quarters leading up to the SPO and was virtually zero at the time of the SPO. This in no way could represent ongoing growth." [80] at 31. Plaintiffs repeated this theory at oral argument. [120] at 85–86. But this argument is not persuasive since "ongoing growth" is consistent with a declining *rate* of growth, and Plaintiffs do not contest that the growth rate was positive when the statement appeared in the offering documents.

As to the statement that growth in the Frozen segment "partially offset" 3Q18 declines in the Grocery segment, here too the scanner data graph in the complaint ([68] ¶ 79) does not show any facts inconsistent with this statement. Birds Eye sales grew year over year throughout 3Q18, meaning that overall Birds Eye sales in the quarter were up from the previous year. Plaintiffs do not allege any facts about the performance of other brands in Pinnacle's Frozen segment. Accordingly, there is no reason to infer that the Frozen segment did not "partially offset" declines in the Grocery segment during 3Q18. Plaintiffs have not plausibly alleged that this statement was false or misleading.

### 4. Additional Alleged Omissions

In addition to Pinnacle's alleged channel stuffing, bad habits, and promotional practices, Plaintiffs argue that other omissions rendered certain statements misleading. As with the other allegations, Plaintiffs do not include enough factual content to plausibly allege that any challenged statement was false or misleading, let alone "identify with particularity the affirmative statement" that each omission "renders misleading." *Cornielsen*, 168 F. Supp. 3d at 1044.

First, Plaintiffs allege that Defendants failed to "timely disclose the full scanner data," [68] ¶ 82, but there are no allegations to connect the dots between

the scanner data and Defendants' statements. The scanner data graph in the complaint shows only year over year growth rates for three individual brands. [68] ¶ 79. Plaintiffs do not provide factual allegations about how the scanner data made any statements false or misleading at the time the statements were made.[6]

Next, Plaintiffs argue that Defendants should have disclosed Birds Eye, Duncan Hines, and Wish-Bone's declining sales and distribution, Wish-Bone's supply chain issues,[7] and Duncan Hines's "SKU proliferation"—an increase in distinguishable product offerings. [68] ¶¶ 96, 113, 123. Plaintiffs, however, do not point to any false or misleading statement by Defendants about Birds Eye, Duncan Hines, and Wish-Bone sales or distribution, Wish-Bone's supply chain, or Duncan Hines's SKU proliferation. To the contrary, the complaint specifically alleges that Defendants disclosed that Pinnacle's Grocery segment experienced declines during 3Q18, [68] ¶ 97, and Plaintiffs represented at oral argument that Duncan Hines and Wish-Bone were components of that segment, [120] at 86.

To be sure, Plaintiffs are not required to identify statements about these exact topics. Even if in theory, such omissions could potentially be actionable if they made Defendants' more general statements about sales and growth misleading, the complaint does not make that connection. For example, at oral argument Plaintiffs alluded to the aggregate sales of Birds Eye, Duncan Hines, and Wish-Bone compared to Pinnacle's overall sales. *See* [120] at 83. But there are no allegations that spell out that comparison. On the pleadings, there is no basis to infer anything concrete about Pinnacle's overall sales growth from declining Duncan Hines and Wish-Bone sales and growing (while at a declining rate) Birds Eye sales.

Finally, the complaint alleges that Defendants called Pinnacle a "leader in innovation," [68] ¶ 112, while Pinnacle's brands in fact had "lackluster innovation," [68] ¶ 10. Plaintiffs contend that Pinnacle covered this up by using low-ROI promotions to "hit targets," [68] ¶ 10, and by engaging in channel stuffing. As discussed above, Plaintiffs have not adequately alleged facts to support the alleged coverup. Even so, this charge has a more fundamental problem. Plaintiffs do not allege any facts that would show Pinnacle's innovation was poor when Defendants made the challenged statements. The only factual support for a misstatement about Pinnacle's innovation is Defendants' post-merger comments. On December 20, Connolly expressed his post-merger belief that Pinnacle's "innovation was

---

[6] Defendants also argue that to the extent scanner data revealed sales volume, *see* [68] ¶ 82, that information alone would be ambiguous. Plaintiffs do not contest this point.

[7] One of Plaintiffs' slides at oral argument appeared to suggest that these "supply chain issues" were channel stuffing. [109-1] at 20. But the complaint includes no factual details about the "supply chain issues" that the Defendants were allegedly aware of at the time of the deal, *see* [68] ¶ 160(k), let alone facts suggesting that they were or amounted to channel stuffing.

insufficient to sustain growth, primarily because it was subpar in its execution." [68] ¶ 157. This statement does not suggest that facts existed about Pinnacle's innovation at the time of the pre-merger comments that rendered them false or misleading. Plaintiffs have provided no factual support for a misstatement about innovation.[8]

### 5. Item 303 Duty to Disclose

In addition to arguing that Defendants' failure to disclose the facts discussed above made a variety of affirmative statements misleading, Plaintiffs also argue that Defendants had an affirmative duty to disclose that information under SEC regulations. As Plaintiffs put it at oral argument, this is a "pure omission" theory. [120] at 49. Plaintiffs rely on Item 303(a)(3)(ii) of Regulation S–K and the following "analogous" SEC guidance: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease." [68] ¶¶ 87, 89.

Item 303(a)(3)(ii) of Regulation S–K "provides that registration statements and annual 10–K reports must reveal 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) (quoting 17 C.F.R. §229.303(a)(3)(ii)). "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC. It is not enough that it should have known of the existing trend, event, or uncertainty." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (Item 303's knowledge requirement satisfied where plaintiffs pled facts with "some specificity" showing that defendants had "actual knowledge of the purported trend").

The Item 303 theory is not persuasive here. First, Plaintiffs provide no support for their contention that Item 303 required Conagra to disclose information about Pinnacle, a separate company, before the merger. All the cases Plaintiffs cite deal with a company's failure to disclose a known trend or uncertainty with respect

---

[8] The complaint also alleges that a "UBS analyst reported in January 2019 that Conagra management candidly revealed that Pinnacle's brands long suffered from 'lackluster innovation' so 'PF needed to rely on trade to hit targets.'" [68] ¶ 10. However, later in the complaint, Plaintiffs provide more detail about the January 2019 UBS report, attributing the quote about lackluster innovation to UBS, not Defendants. [68] ¶ 160(k) ("*UBS also stated that*: 'Pinnacle's root issue is a lackluster innovation, because then PF needed to rely on trade to hit targets.'"). And even if one of the Defendants said Pinnacle's brands had "long suffered" from "lackluster innovation" after the deal, that would not be enough to show that Pinnacle's innovation was poor at the time of the challenged statements.

to its *own* operations.  *See, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 16-cv-00815, 2019 WL 762510, at *5 (N.D. Ind. Feb. 20, 2019); *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019).  Item 303 requires disclosure of trends that could impact "net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Nothing about this language suggests that the disclosure requirement could apply to the operations of a potential acquisition target; if anything, the reference to "continuing operations" appears to suggest the opposite.

Second, since Plaintiffs have not adequately alleged any channel stuffing (much less fraudulent channel stuffing), they likewise have not alleged that Defendants had a duty to disclose channel stuffing as a "known trend."

Third, Plaintiffs have not alleged facts that show a "known" trend or uncertainty from Defendants' point of view with respect to Pinnacle's pricing, margins, volume, or promotional practices (again, irrespective of whether the trend amounted to fraud).  *See Indiana Pub. Ret. Sys.*, 818 F.3d at 95 (2d Cir. 2016).[9]

Finally, the parties disagree about whether private parties can enforce Item 303's disclosure requirements pursuant to either the Securities Act or the Exchange Act.[10]  The court need not answer this question.  Even if Plaintiffs could enforce Item 303's disclosure requirements through the federal securities laws, they do not adequately allege any known trend or uncertainty within Item 303's scope that Defendants failed to disclose in an SEC filing.  Plaintiffs' reliance on Item 303 to show an actionable omission fails.

---

[9] Plaintiffs are not clear on which, if any, of Defendants' SEC filings were subject to Item 303's disclosure requirement regarding known trends and uncertainties.  Defendants argue that Form 8-K is not.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014) (Item 303 requires disclosure "in 10–K and 10–Q forms"); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016) (same).  However, Item 303 appears to also apply to "registration statements."  *Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001).  Since Item 303 could not supply a duty to disclose trends involving Pinnacle's alleged channel stuffing or promotional practices in this case, the court need not decide which, if any, of Defendants' SEC filings were subject to Item 303.

[10] Defendants also argue—and Plaintiffs do not contest—that Item 303 itself does not give rise to a private right of action.  *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 2019 WL 3819305, at *16 (11th Cir. Aug. 15, 2019) ("no court of which we are aware has found a private right of action under Item 303").

### 6. Statements of Opinion

Defendants also contend that many of the statements at issue were statements of opinion that were neither false nor misleading under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).

The Seventh Circuit has yet to decide whether the reasoning in *Omnicare*, which addressed Section 11 of the Securities Act, applies to claims under Section 10(b) of the Exchange Act and Rule 10b-5. Neither party argues that *Omnicare* does not apply here; nor does there appear to be an obvious reason why *Omnicare* would not apply in this context. Section 11 and Rule 10b-5 contain virtually identical prohibitions against untrue statements of material fact and omissions of material fact necessary to ensure a statement is not misleading. *Compare* 15 U.S.C. § 77k(a) *with* 17 C.F.R. § 240.10b-5(b). In *Omnicare*, the Court noted that the principles it set forth were "not unique to § 11." 575 U.S. at 191. And other courts have applied *Omnicare* to Section 10(b) claims. *See Tongue v. Sanofi*, 816 F.3d 199, 211–12 (2d Cir. 2016) (applying *Omnicare* to claims arising under Section 10(b) and Rule 10b-5, as well as Section 11); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (holding that *Omnicare's* standards for opinion falsity apply to Section 10(b) and Rule 10b-5 claims); *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-cv-01640, 2020 WL 2735366, at *5 (N.D. Ill. May 26, 2020).

Accordingly, the court assumes that *Omnicare* applies in addressing (1) whether any of Defendants' statements offered opinions, not facts, and (2) if so, whether those statements of opinion are nonetheless actionable.

First, Defendants contend that statements predicting future events, including that integration of Pinnacle would be "seamless" and would deliver "attractive financial returns," [68] ¶ 61, are necessarily statements of opinion.

The Seventh Circuit has long held that "cases involving forward-looking statements are unique." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) (citing *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993) ("[P]redictions of future performance are inevitably inaccurate because things almost never go exactly as planned.")); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018). As a result, even before the PSLRA's enactment, the Seventh Circuit described the standard for forward-looking statements as a "safe harbor," requiring plaintiffs to allege "specific facts" illustrating that the predictions "lacked a reasonable basis." *HealthCare Compare Corp.*, 75 F.3d at 281 (quoting *Arazie*, 2 F.3d at 1468); *see also In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99-cv-06853, 2000 WL 1705279, at *10 (N.D. Ill. Nov. 14, 2000). Likewise, as the Supreme Court noted in *Omnicare*, a "fact is 'a

thing done or existing' or '[a]n actual happening,'" while an "opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'" 575 U.S. at 183 (citing Webster's New International Dictionary 782, 1509 (1927)) (alterations in original). "Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.*

In line with these principles, numerous courts have held that future predictions are more properly analyzed as opinion statements. *See Martin v. Quartermain*, 732 F. App'x 37, 40–41 & n.1 (2d Cir. 2018) ("expressions of optimism" and "projections about the future" are "quintessential opinion statements"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) ("Statements that express expectations for the future rather than presently existing, objective facts are also statements of opinion.") (internal quotations omitted); *Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 467 (7th Cir. 1981) ("predictions of future events" at issue could not have been "anything but opinions" in the context of a state law fraud claim).[11]

So too here. Defendants' pre-merger predictions about the merger's success and effects were statements of opinion, not fact. As Plaintiffs point out, the challenged statements do not contain qualifiers such as "I think" or "I believe." But even without qualifiers, the content of future predictions makes the distinction clear: it is hard to express certainty about the future. Defendants' pre-merger predictions were expressions of opinion.

Next, Defendants argue that characterizations of Pinnacle's portfolio as "complementary" to Conagra's, "very strong," and "growing," [68] ¶¶ 60, 63–64, 100–101, were statements of opinion as well, and they call the characterization of Pinnacle's innovation program as "robust," [68] ¶ 97, a "classic statement of opinion," [76] at 37. In response, Plaintiffs focus on the verifiability of claims that Pinnacle's portfolio was "very strong" and "growing." Defendants point out that it is not clear what statements of fact are included in a claim about the growth and strength of a portfolio or brand. Plaintiffs disagree, arguing the clear implication is that these statements referred to sales. But even accepting that argument, a question remains whether descriptors like "very strong," "growing," and "robust" are assertions of fact rather than opinion.

---

[11] Defendants also cite cases holding that statements "so clearly constituting the opinions of the speaker" may be immaterial corporate puffery. *See Silverman*, 2008 WL 4360648, at *9; *City of Marysville Gen. Emps. Ret. Sys. v. NightHawk Radiology Holdings, Inc.*, 2011 WL 4584778, at *9 (D. Idaho Sept. 12, 2011). But this is an argument about materiality, not falsity, and the court addresses it separately below.

Plaintiffs argue these types of statements are not necessarily opinions since the court must consider the context as well as the statements' form. For example, in *Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, No. 16-cv-10510, 2018 WL 1071442 (N.D. Ill. Feb. 27, 2018), the court addressed statements made in response to an investor question about claims frequency that "our frequency so far has been extremely favorable to prior year" and "our frequency trends have been good." *Id.* at *3. When a slight "tick-up" in claim frequency came to light, the defendants said that after analyzing the tick-up for an "untold number of hours," they concluded the tick up was the result of external factors; yet defendants failed to disclose "Allstate's reduction in underwriting standards." *Id.* The court held that considering defendants' representations that they had "analyzed this to death" and "considered all possible reasons for the increase," the statements could not be "read to suggest that defendants' conclusions were uncertain or mere opinions." *Id.* at *4.

The allegations in this case are quite different. Plaintiffs have not pointed to any similar representation that the generalized descriptors were the result of comprehensive or thorough calculations, or any other indicators of certainty. The context points in the opposite direction—that the statements represented defendants' opinions as to the strength and complementary nature of Pinnacle's portfolio. The court thus agrees with Defendants that these challenged descriptions of Pinnacle's portfolio were statements of opinion rather than representations of verifiable fact.[12]

However, that does not end the analysis. The court must now determine whether these statements of opinion are actionable under *Omnicare*. There, the Supreme Court explained that a "pure statement[] of opinion" (as opposed to one containing an embedded statement of fact) is only "false" if the opinion is not "honestly held." 575 U.S. at 186. As discussed below with respect to scienter, the complaint does not plausibly suggest Defendants did not honestly believe these statements. However, statements are actionable if they are either false *or* misleading, and an opinion statement may be misleading if it "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189. To proceed on this theory, Plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not

---

[12] Plaintiffs also appear to argue that since Conagra's stock declined and analysts revised guidance and reacted with surprise after Defendants' post-merger statements, these statements must have been interpreted by investors as assertions of fact. This argument is not persuasive for two reasons. First, this circumstantial evidence cannot show that investors relied on the specific statements Defendants argue constitute opinion, not fact. Second, distinguishing between opinion and fact statements is an objective inquiry. *See Omnicare*, 575 U.S. at 187 ("A reasonable person understands, and takes into account, the difference we have discussed above between a statement of fact and one of opinion.").

have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.

As discussed above, Plaintiffs argue that Defendants omitted material facts about the basis of at least one opinion: predictions of simultaneous sales growth and improved margins were misleading because Defendants failed to disclose Pinnacle's "margin eroding low-ROI promotions and discounts" and "lackluster" brand innovation. [80] at 51. As already discussed, Plaintiffs do not adequately allege specific pieces of information available at the time of the challenged statements that support these alleged omissions. Moreover, *Omnicare* requires even more for opinion statements: facts about the "the inquiry the issuer did or did not conduct or the knowledge it did or did not have." 575 U.S. at 194. The complaint does not contain these allegations either. Plaintiffs have not alleged facts suggesting the challenged statements of opinion, including future predictions about the merger and characterizations about the strength and growth of Pinnacle's portfolio, were either false or misleading.

To recap, Plaintiffs have not plausibly alleged that Defendants made false or misleading statements or breached an affirmative duty to disclose.

### C. Materiality - Puffery

Moving on, Defendants next argue that several of the challenged statements were immaterial statements of "puffery."

To be actionable, a statement must be both false *and* material. *Tellabs I*, 437 F.3d at 595; *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015). To determine materiality, courts look to "the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.3d at 596. As an application of this rule, if a "statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.*; *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b-5."); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).

Plaintiffs argue that the materiality of a given statement generally presents a question of fact. However, "courts can and have decided materiality as a matter of law when the facts allow." *Silverman v. Motorola, Inc.*, No. 07-cv-04507, 2008 WL 4360648, at *8 (N.D. Ill. Sept. 23, 2008); *see also Newell*, 2000 WL 1705279, at *7 (noting that if a "reasonable investor could not have been swayed by an alleged misstatement, a court may determine as a matter of law that the misstatement was not material"). In particular, "[c]ourts have held immaterial as a matter of law loosely optimistic statements that are so vague, so lacking in specificity, or so

clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (citing cases).

Defendants argue certain challenged statements were indeed so vague and lacking in specificity that no reasonable investor could find them important. The court addresses each category in turn.

### 1. Growth Predictions

First, Defendants argue that the statements predicting general "growth" fall into the category of corporate puffery. Defendants focus on the challenged statements concerning the growth of Pinnacle's portfolio, [68] ¶¶ 60, 109, Pinnacle's "ongoing growth," [68] ¶ 97, Pinnacle being one of the "fastest-growing companies," [68] ¶ 64, Conagra's expectation that Pinnacle's "top line growth" would continue at the pace already delivered, [68] ¶ 63, and the merger being "a tremendous opportunity to drive profitable growth," [68] ¶ 122. Plaintiffs argue that statements about Pinnacle's "key business metrics" could not amount to mere puffery. [80] at 43–44. But the relevant question is not the materiality of the statement's topic (i.e., key business metrics), but rather whether the statement has enough specificity to make it material as a matter of law.

The Seventh Circuit has explained that "indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). Generally, "predictions and forecasts which are not of the type subject to objective verification are 'rarely' actionable under the PSLRA." *Van Noppen*, 136 F. Supp. 3d at 940 (quoting *Searls*, 64 F.3d at 1066); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("The whole discussion of growth is plainly by way of loose prediction, and both the range of rates cited, as well as the time for their achievement, are anything but definite. . . . projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.") (citations and internal quotation marks omitted).

Defendants' claim that the merger presented "a tremendous opportunity to drive profitable growth" and description of Pinnacle as one of the "fastest-growing companies" fall into the category of immaterial corporate puffery. The statements are vague, general, and raise questions such as how much profitable growth and how soon, fastest-growing by what metric, in what time period, and compared to what other types of companies. *See, e.g., Silverman v. Motorola, Inc.*, No. 07-cv-04507, 2008 WL 4360648, *9 (N.D. Ill. Sept. 23, 2008) (statements about a company's "strong balance sheet . . . and proven record of growth," which made it "well-positioned to continue creating value," were "so vague and unspecific that no reasonable investor would rely on it," and descriptions of a company as "the fastest-

growing high-tech high-cap company," were "broad and undetailed" and therefore "immaterial as a matter of law").

Other statements warrant a closer look. For example, Conagra's expectation that Pinnacle's "top line growth" would continue at the pace already delivered, [68] ¶ 63, could be read as providing a "measurable prediction of the results to be achieved." *Blatt v. Corn Prod. Int'l, Inc.*, No. 05 C 3033, 2006 WL 1697013, at *4 (N.D. Ill. June 14, 2006). However, Plaintiffs do not allege facts sufficient to make this connection.

In *Blatt*, the defendant predicted "improving operating margins and a [higher rate] of return on its capital," and explained that it expected "that its U.S. sweetener prices will increase in the low-single-digit range in 2005," and that it believed "the price increase will be sufficient to offset higher energy costs in the U.S. business." *Id.* at *2 (alteration in original). Accordingly, the court reasoned that "the context of discussing specific factors that might affect profits and operating margins" tended to "show that Defendants' statements were not simple expressions of optimism but reasoned predictions of the future." *Id.* at *4. Similarly, in *Tellabs I*, the court held that "we're still seeing that product continue to maintain its growth rate" was not puffery given its context: an answer to an investor question about a specific product's potential sales decline. 437 F.3d at 597; *see also Silverman*, 2008 WL 4360648, at *10 (materiality of statements supported by fact that they were made in response to specific investor questions).

Here, there are no allegations that Defendants' statements about growth were made in the context of any comparable discussion. Plaintiffs argue the context included discussions about Pinnacle's top line growth, net sales, and gross margin—key business metrics. But none of the surrounding statements about those metrics conveyed a measurable prediction of results based on calculations or modeling. Instead, Defendants' statements read as optimistic statements based on a variety of intangible features or characteristics of the deal, such as potential synergies and the complementary nature of the companies' portfolios. Plaintiffs also note that one statement—Connolly's claim that Pinnacle was an "outstanding investment opportunity"—was made in response to an investor question. [80] at 46 n.12. But nothing about the context of the question and response reveals a more specific statement of fact within the general phrasing of Connolly's answer.

The court is mindful not to evaluate each statement in isolation. *See Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *2 (N.D. Ill. Oct. 30, 2012) ("Particular allegations are not assessed in a vacuum."); *United States SEC v. Stifel, Nicolaus & Co., Inc.*, No. 11-C-0755, 2012 WL 4069346, at *6 (E.D. Wis. Sept. 14, 2012). But even taken together and in context, the statements about Pinnacle's growth do not have enough specificity to allow "objective verification." *Van Noppen*, 136 F. Supp. 3d at 940.

## 2.    Predictions of Financial Benefits and Synergies

Second, Defendants argue the predictions about the merger's likely financial benefits were similarly indeterminate.  According to the complaint, Defendants touted "attractive financial returns," [68] ¶ 61, "compelling financial benefits," [68] ¶ 106, and "an outstanding investment opportunity," [68] ¶ 108, and called the deal a "no-brainer," [68] ¶ 114, and "highly compelling," [68] ¶ 118.  Defendants also predicted the merger would have a positive effect on Conagra's adjusted gross margin, [68] ¶ 62, would be "a catalyst to accelerate value creation for shareholders," [68] ¶ 100, and would create "a tremendous platform to drive meaningful shareholder value," [68] ¶ 101.

Arguing that predictions about the synergies and potential for a successful integration would be material to reasonable investors, Plaintiffs rely on *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802 (N.D. Ill. 2017).  There, the court held that statements about the integration of recently acquired companies being "on track" included statements of "present fact."  *Id.* at 817.  The court held that the present, not forward-looking, portions of the "on track" statements were not immaterial as a matter of law, since the complaint alleged that "the failure to timely integrate Akorn's subsidiaries had a detrimental effect on the accuracy of Akorn's financial statements."  *Id.*  This case is inapposite.  Here, Defendants' statements about the merger were all forward-looking and did not include representations about the timeline for integrating Pinnacle.  *See Searls*, 64 F.3d at 1067 (predictions of "high" "disposition gains" were not "sufficiently definite so as to constitute material misstatements of fact," in part because it was unclear how "far into the future" the gains would extend).

Plaintiffs also argue that investor and analyst reaction to Defendants' post-merger statements supports the materiality of these pre-merger statements.  It is true that in general, "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were material."  *Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012); *see also Akorn*, 240 F. Supp. 3d at 816.  However, the post-merger stock drop and investor reaction allegations are not enough to show the materiality of these particular statements.  That *some* pre-merger statements influenced investor and analyst expectations is consistent with other statements amounting to immaterial corporate puffery.  *See Silverman*, 2008 WL 4360648, at *10 (in a stock drop suit, distinguishing between statements that were puffery and those that were not).

Defendants' generalized statements about the likely financial benefits and synergies of the deal were not determinate enough to be material to a reasonable investor.  *See Newell*, 2000 WL 1705279, at *7 (statements that a combination was "an exceptional strategic fit," statements that the resulting products "will be

attractive to consumers," and "references to synergies that management expected to result from the merger" were all immaterial puffery).

### 3. Statements about Innovation

Finally, Defendants argue that the statement about "robust innovation" in Pinnacle's Frozen segment, [68] ¶ 97, does not clear the puffery bar. The court agrees that the word "robust" is vague. *See, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (statement that past results were "better than expected" and "robust" was "vague and nonactionable"). And without context conveying something specific, measurable, or concrete, "innovation" as used here is not an easily quantifiable concept either. As with the above statements, this statement was simply too vague to be material to a reasonable investor.

In sum, even if Plaintiffs had adequately pled that Defendants' statements were false or misleading, many of the challenged statements are vague and indeterminate expressions of optimistic puffery. Those statements cannot give rise to liability for securities fraud.

### D. PSLRA Safe Harbor

Next in line is the PSLRA's safe harbor, which limits liability for forward-looking statements. Materially identical safe harbor provisions appear in both the Exchange Act and the Securities Act. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004), *as amended* (Sept. 3, 2004) ("Section 77z–2, which deals with statements covered by the Securities Act of 1933 . . . and § 78u–5, which deals with statements covered by the Securities Exchange Act of 1934 . . . are identical in all significant respects."). Under the safe harbor provision, a "forward-looking" statement cannot give rise to liability if it was (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. §§ 78u-5(c)(1)(A)(i), 77z-2(c)(1)(A)(i), or (2) it was not made with "actual knowledge" that it was "false or misleading," §§ 78u-5(c)(1)(B)(i)-(ii), 77z-2(c)(1)(B)(i)-(ii).

The parties do not dispute that the safe harbor is disjunctive, meaning it applies if either the statement was accompanied by sufficient meaningful cautionary statements or it was made without actual knowledge of the statement's falsity or misleading nature. *See, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 876 (N.D. Ill. 2011). Defendants argue that both prongs of the safe harbor prevent liability for certain forward-looking statements. The court addresses the first prong here and addresses the second prong during the discussion of scienter below.

### 1. Forward-Looking Statements

The PSLRA defines "forward-looking statement" to include any of the following (as well as other statements not relevant here):

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> . . . .

15 U.S.C. §§ 78u-5(i)(1); *see also* 77z-2(i)(1).

Defendants argue that most of the challenged statements about Pinnacle's growth, the merger's integration, and the merger's benefits were forward-looking statements within the statutory definition. Plaintiffs do not contest this argument as a general matter, but instead argue that many of the pre-merger statements cited by Defendants included statements of present fact.

"[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs II*, 513 F.3d at 705. Otherwise, it would be easy to insulate representations of present fact just by commingling them with future predictions. *Id.*

Plaintiffs argue that several of the statements Defendants contend are forward-looking are mixed. For example, the statement "We expect top line growth to continue at the pace both companies have delivered," [68] ¶ 63, includes both a prediction about future growth and a representation that both companies have delivered growth in the past. Similarly, "The combination of two growing portfolios of iconic brands will serve as a catalyst to accelerate value creation for shareholders," [68] ¶¶ 60, 100–101, both predicts future value creation and represents that Pinnacle's portfolio was "growing" at the time of the statement.

Defendants do not meaningfully contest this point but emphasize that the parts of mixed statements that do refer to the future are still entitled to the safe harbor. As to the portions referring to the present, Defendants rest on their arguments about why those statements were not false or misleading.

The parties further dispute the applicability of the safe harbor to the claim in the prospectus supplement that 3Q18 declines in Pinnacle's Grocery segment were "partially offset by ongoing growth in Pinnacle's Frozen segment, led by the Birds Eye franchise, which continued to drive Pinnacle's robust innovation program." [68] ¶ 97. Plaintiffs again contend that the references to Pinnacle's "robust innovation program" and "ongoing growth" in its Frozen segment were statements of present fact. Defendants disagree, arguing that the entire context of this statement was a discussion of 3Q18 results, which had not been finalized or released at the time of the statement. The supplement stated: "Pinnacle expects net sales to be in the range of $740 million to $745 million." [77-7] at 11. It also noted that final results could vary pending financial closing procedures. [77-7] at 12. On the other hand, 3Q18 had already ended when the statement was made. The question then is whether these statements—made in the context of results that had already occurred but had not been finalized—were future predictions.

Under the circumstances here, the uncertainty inherent in the discussion of preliminary quarterly results is not enough to turn statements about present facts into predictions about the future. Plaintiffs note the use of present tense, but that alone is not dispositive. *See Tellabs III*, 513 F.3d at 705 ("'Our earnings are certain to double' is in the present tense, but is a prediction."). Nonetheless, Defendants' statement clearly represents that at the time, Pinnacle's Frozen segment was experiencing "ongoing growth" and Pinnacle's innovation program was "robust." While the "preliminary" qualification hedges the discussion to the extent that further analysis could undermine these conclusions, these statements were phrased as representations about present facts based on present information, not as speculative predictions. *See* [77-7] at 12 (noting that the preliminary 3Q18 results "represent the most current information available to Pinnacle's management"). Moreover, while the supplement said, "Pinnacle expects net sales to be in the range of $740 million to $745 million," it did not qualify the statements about ongoing growth or robust innovation with "expects." A reasonable investor could infer that while the exact range of net sales was still being finalized, Conagra had enough information to make the challenged statements of fact.

Nonetheless, Defendants argue that the statements about growth and innovation were statements of the "assumptions underlying or relating to" the expectation about net sales. 15 U.S.C. §§ 78u-5(i)(1)(D); 77z-2(i)(1)(D). But Defendants' proposed reading of the statute would swallow the Seventh Circuit's rule regarding mixed present/future statements. *See Tellabs I*, 513 F.3d at 705 ("The element of prediction in saying that sales are 'still going strong' does not

entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales."). Defendants' only authority for treating an expression of present fact as an "assumption" entitled to safe harbor protection is *W. Pennsylvania Elec. Employees Pension Tr. v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 n.6 (E.D. Wis. Mar. 6, 2009) (treating the statement "we are seeing some decent strength in both of those" as forward-looking, since it was an assumption underlying a future projection). In context, the statement in that case reads as a forward-looking assumption about future growth based on indeterminate present observations. The portions of the challenged statements expressing present facts about Pinnacle's growth do not have a similar tenor. Applying the safe harbor to these components of the challenged statement about 3Q18 would be inconsistent with the Seventh Circuit's reasoning in *Tellabs I*.

In sum, the forward-looking portions of the challenged statements about Pinnacle's growth, the merger's integration, and the merger's benefits fall within the PLSRA's safe harbor. The statements of present fact mixed into those statements, and the ones made in the context of preliminary 3Q18 results, do not.

### 2. Meaningful Cautionary Statements

The court now turns to whether those forward-looking statements about Pinnacle's growth, the merger's integration, and the merger's benefits were accompanied by meaningful cautionary statements.

The safe harbor insulates statements from liability when they are both "identified as a forward-looking statement" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §§ 78u-5(c)(1)(A)(1); 77z-2(c)(1)(A)(1). To be "meaningful," a cautionary statement should identify "those sources of variance that (at the time of the projection) were the principal or important risks." *Asher v. Baxter Intern. Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). But a cautionary statement is not inadequate whenever a firm's disclosures are "false or misleadingly incomplete," since such a rule would make the safe harbor's protections "defunct." *Id.* at 729. Thus, "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." *Silverman*, 2008 WL 4360648, at *12 (quotation omitted).

Defendants argue that the forward-looking statements in the June 27, 2018 Form 8-K (which incorporated the June 27 press release) were accompanied by cautionary language. That form contained a "CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS," which included warnings about, among other things, "changing consumer preferences," "the success of our innovation and marketing investments," and "[Conagra's] ability to successfully execute [its] long-term value creation strategy," as well as "general economic and

industry conditions." [77-2] at 4–5. It also noted "the risk that the cost savings and any other synergies from the proposed transaction may not be fully realized or may take longer to realize than expected, including that the proposed transaction may not be accretive within the expected timeframe or to the extent anticipated." [77-2] at 4–5.

The court cannot conclude on the pleadings that these cautionary statements were meaningful enough to shield accompanying forward-looking statements from liability. Meaningful cautionary language must "be substantive and tailored to the specific predictions made in the allegedly misleading statement." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 874 (N.D. Ill. 2011) (quoting *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009)). These statements are not "specifically tailored to the company's business," but instead simply warn "of general risks applicable to any business." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 (N.D. Ill. 2003). They do not bear resemblance to the "highly specific cautionary statements" courts have approved in cases like *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004) (noting industry-specific factors such as the fact that "[v]ideogame products typically have market life spans of only three to 12 months," and company-specific sources of risk: "We have experienced and continue to experience significant quarterly fluctuations in net sales and other operating results due to a variety of factors, including . . . .").

As Plaintiffs note, the language in the Form 8-K fails to warn about any risks associated with Pinnacle's existing business practices.[13] That is, while Defendants warned about the types of future events that could cause problems for mergers and integrations generally, they did not warn that any present facts about Pinnacle's business model could cause problems.

Defendants cite *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 954 (N.D. Ill. 2003) (holding that cautionary statement identifying "risks associated with introducing new products, entering new markets, availability of resources, competitive response, and the economic conditions in the telecommunications industry" were sufficiently meaningful), but in an appeal from a subsequent decision the Seventh Circuit found that the defendant "did not accompany its

---

[13] Plaintiffs also contend that these warnings were inadequate because they did not convey "known" risks about Pinnacle's business such as declining organic sales and gross margin and lackluster innovation. But knowledge plays no role in this analysis. *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 876 (N.D. Ill. 2011) (rejecting argument that cautionary statements were not meaningful "because Defendants knew that the identified risk factors were already occurring," since the first prong of the safe harbor "does not require any consideration of a defendant's state of mind"). The inquiry instead concerns which risks were the principal or important ones at the time of the statement.

financial projections with a 'meaningful cautionary statement.'" *Tellabs I*, 437 F.3d at 600. The Seventh Circuit held that in light of the allegations of the complaint— that one product's demand was "drying up" and that production of another product was "far behind schedule"—warnings that "downturn in the telecommunications industry" could affect forecasts and that there were "risks associated with introducing new products" were too broad to allow the court to conclude that they meaningfully described the "principal or important risks" facing the company at the time the statements were made. *Id.* at 599; *see also Asher*, 377 F.3d at 734 ("For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them.").

Likewise here. Factors like "changing consumer preferences," the success or failure of "innovation and marketing investments" and Conagra's "long-term value creation strategy," and the timing of "cost savings and any other synergies" may very well have been the principal sources of risk. But this language does not identify business-specific factors that would allow investors to evaluate these risks. The Seventh Circuit's reasoning in *Asher* and *Tellabs I* compels the conclusion that the cautionary statements in this case were not sufficiently meaningful. Accordingly, Defendants' statements are not shielded from liability by the first prong of the safe harbor. The court discusses the second prong further below.[14]

To recap so far: the cautionary language in the Form 8-K does not bring Defendants' forward-looking statements within the safe harbor, but in any event, Plaintiffs have not adequately alleged that Defendants made any actionable, material, false or misleading statements that could support Plaintiffs' primary liability claims under the Securities Act or the Exchange Act.

### E. Scienter

As to the Exchange Act claim, Defendants also argue that Plaintiffs have also failed to allege scienter. Again, Plaintiffs support their Exchange Act claim with all of the challenged statements in the complaint.

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Courts must ask "whether *all* of the

---

[14] Since the cautionary language was not meaningful in this case, the court does not address whether meaningful cautionary language could bring statements made outside the document containing such language within the safe harbor. *See, e.g., Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004) ("[W]e take the claim as the pleadings framed it: the market for Baxter's stock is efficient, which means that Baxter's cautionary language must be treated as if attached to every one of its oral and written statements.").

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 323 (emphasis in original). Plaintiffs must state with particularity facts giving rise to a "strong inference" that the Defendants "either knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Tellabs III*, 513 F.3d at 704. To be "strong," an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In other words, "first the inference must be cogent, and second it must be as cogent as the opposing inference, that is, the inference of lack of scienter." *Tellabs III*, 513 F.3d at 705.

Defendants argue both that the facts on which Plaintiffs rely fail to support a "cogent" inference of scienter and that certain facts affirmatively support the opposing inference. Defendants argue that the following inference is more compelling than any inference of scienter: "that Conagra fully expected (and still expects) the deal to succeed; that it had less than complete visibility into Pinnacle before the merger closed, when Conagra and Pinnacle were operating as separate companies and competitors; and that Conagra learned new information after the deal closed that caused it to revise its timing estimates of realization of the full deal synergies." [76] at 51. For the following reasons, the court agrees.

## 1. Due Diligence

Defendants argue that Plaintiffs' scienter allegations revolve around an assumption that Defendants "would have" discovered the channel stuffing, promotions, and other "bad habits" during due diligence. *See* [68] ¶¶ 8, 21, 125–26, 129. They argue that such an assumption is insufficient to satisfy the PSLRA's pleading requirements for scienter.

The Seventh Circuit has emphasized that "hindsight" cannot be the "only basis" of a proposed scienter inference, since there is no "fraud by hindsight." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007); *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978). Accordingly, courts in this district have declined to allow plaintiffs to use a "must have known" theory as "an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *In re Bally Total Fitness Sec. Litig.*, No. 04-cv-03530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006). Particularized facts are especially important in the merger context, in which a company may have less than complete access to information prior to a deal's close. *See In re Apogee Enterprises, Inc. Sec. Litig.*, No. 18-cv-03097, 2020 WL 1445856, at *12 (D. Minn. Mar. 25, 2020) (no strong inference of scienter where allegations that "describe[d] the due diligence in general terms," along with the defendants' post-merger statements about what they learned during diligence, tended "to show that Defendants disclosed what they knew of problems with EFCO as they learned

them"). With these standards in mind, the court analyzes the sufficiency of Plaintiffs' due diligence allegations.

First, Plaintiffs argue that Defendants had access to an electronic data room established for Conagra's diligence that contained "sales, pricing, promotional contracts and other key financial data"—Plaintiffs do not provide any more detail— that would "have necessarily revealed" Pinnacle's organic sales were declining. [80] at 36. This is insufficient.

Plaintiffs have failed to allege any particularized facts suggesting that Conagra, Connolly, or Marberger learned about any channel stuffing, low-ROI promotions, other "bad habits" during diligence. In another case alleging channel stuffing, the court held that the complaint failed to adequately allege scienter in part because it did "not identify any instances in which [defendants] evidenced knowledge of the alleged conduct or were present for specifically identified meetings or communications in which channel-stuffing was specifically alleged to have been discussed." *Spectrum Brands*, 461 F. Supp. 2d at 1315–16. There, plaintiffs' "vague circumstantial arguments to support a general speculative conclusion that the Defendants were in a position to have known" were not enough. *Id.*

That reasoning applies here. The complaint's allegations about Defendants' due diligence mention "books and records," "promotional contracts," and scanner data, *see* [68] ¶¶ 8, 21, 125–26, 129, but do not provide "any sense of how the dots connect," *Kohl's*, 895 F.3d at 940. The complaint includes no allegations about any specific information in any books, records, contracts, or scanner data that (1) was available to Defendants during diligence, and (2) could have put Defendants on notice about Pinnacle's alleged channel stuffing, promotions, and practices. The complaint thus does not "allege any specific source of information that would have disclosed the alleged fraud." *Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 776 (N.D. Ill. 2010); *see also In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) ("Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made.").

The only document Plaintiffs cite is the "2018 Modified Management Case for fiscal years 2018 through 2020," which was allegedly in the electronic data room. [68] ¶ 124. This allegation adds nothing to Plaintiffs' scienter theory, since the complaint says nothing about that document or any information it contained.[15]

---

[15] Defendants attach this document to their response, [77-1] at 69, and argue it contains no information that could support scienter. Plaintiffs do not respond to this argument, so any claim based on the significance of this document is waived. *See Lee v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1054 (7th Cir. 2019).

Moreover, even if Plaintiffs had adequately pled *access* to information that would have put Defendants on notice, there are no allegations suggesting that the individual defendants actually reviewed that information. *See Cornielsen*, 916 F.3d at 602 ("[A] complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information."); *Pugh v. Tribune Co.*, 521 F.3d 686, 694 (7th Cir. 2008) (allegation that it would have been "a relatively easy task" for executives to verify "the accuracy of their newspaper sales" was "wholly conclusory"); *Greer*, 683 F. Supp. 2d at 776 (holding that "allegations of access in and of themselves fail to sufficiently allege scienter" where plaintiffs alleged "access to all of Pixelon's senior level managers, books, records, contracts, and financial information"); *Harley-Davidson*, 660 F. Supp. 2d at 998 ("mere receipt" of reports "containing facts that made published statements false and misleading" was insufficient to support scienter).

Plaintiffs have not cited any cases where the court drew a strong inference of scienter simply because diligence occurred, without additional particularized facts. *See, e.g.*, *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 840 (E.D. Mo. 2019) (while the "long duration of due diligence" contributed, among other factors, to "a strong showing of scienter" with respect to post-merger statements, there were "inadequate facts indicating such knowledge as of the March merger date"); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *19 (W.D. Wash. Apr. 19, 2019) (relying "on the so-called 'core operations' inference to establish scienter" with respect to an executive's knowledge of her own company's legal compliance where she "performed detailed due diligence regarding the company's legal compliance" for the company's merger, and also made "numerous statements displaying [her] familiarity with how [the program at issue] was designed and operated").

Second, Plaintiffs' allegation about Conagra and Pinnacle's shared customers does not raise a strong inference of scienter. Plaintiffs allege: "Conagra's business with the same retail super markets would have provided further insight as to the presence of key Pinnacle product promotions, discounts and sales activity with respect to Birds Eye, Duncan Hines and Wish-Bone as their joint customers." [68] ¶ 129. This claim is not supported by particular facts. As discussed previously, the complaint has not alleged anything about the terms of Pinnacle's "promotions, discounts and sales activity" or which customers were offered such deals. As such, the complaint does not supply particularized facts about any common customer that both knew about Pinnacle's practices and would have alerted Conagra. Post-merger analyst speculation that Conagra "had industry sources (customers, e.g.) that could have set off warning flares months ago," [68] ¶ 160(b), cannot substitute for factual allegations about who those sources were or what information they provided.

Third, Plaintiffs argue that if Defendants did not learn about the "sales, pricing and gross margin information at issue" during diligence, that would have been a violation of their "duty to Conagra shareholders to conduct adequate due

diligence." [80] at 38. Thus, they argue even if Defendants lacked actual knowledge, the failure to learn would have been reckless.

Defendants respond that the relevant question is whether Defendants were reckless regarding the truth or falsity of their statements, not whether, as a general matter, they were reckless in investigating Pinnacle. This distinction is not as clear cut as Defendants make it out to be. *See Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (where "the company's very survival was at stake," executives' lack of knowledge about company's "ability or inability to refinance its looming debt" would "amount to reckless disregard"); *Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 989 (N.D. Ill. 2001) (same). However, Plaintiffs must still plausibly allege that the speaker was reckless with respect to a particular statement's truth or falsity. The allegations here do not suggest this occurred. There are no allegations, for example, about any deliberate choices not to investigate facts material to the challenged statements.

Plaintiffs nonetheless argue that scienter can be inferred when executives make statements about core or critical aspects of their own companies. True, courts have recognized that "an inference of scienter based on a 'core operations' theory is viable in this Circuit." *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17-cv-01713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018) (citing *Tellabs III*, 513 F.3d 702, and *Kohl's*, 895 F.3d 933); *see also Tellabs III*, 513 F.3d at 709 ("very hard to credit" story that senior management did not know statements about demand for the company's "most important products" were false); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *Desai*, 654 F. Supp. 2d at 860 (strong inference possible where "it is almost inconceivable" that a defendant would be "unaware of the matters at issue"); *Silverman*, 2008 WL 4360648, at *14 (same).

But the claim that here, the "sales, pricing and gross margin information at issue" were "central" to Pinnacle's operations, and the "pre-merger state of Pinnacle's brands and their sales growth (or lack thereof), and Connolly's planned post-merger transformation of Pinnacle's brands, were core to an enormous $10.9 billion transaction," [80] at 41, stretches this inference too far. In this case, there is an important distinction between Defendants' own company and a company about to be acquired. The potential limits on access to information during merger diligence make any inference that Defendants must have been aware of a given issue by virtue of their position more attenuated. Plaintiffs do not cite any cases— and the court is not aware of any—applying a "core operations" theory in a case like this one involving merger diligence of another company.

Defendants also argue that Pinnacle's alleged problems were not big enough to infer that even Pinnacle's own executives would have known about them. In a typical case, "senior positions" within a company "do not suggest scienter without

additional support from internal documents or communications." *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17-cv-01713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018); *see also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 837 (N.D. Ill. 2000) ("pleading scienter based exclusively on a defendant's corporate position is insufficient to survive a motion to dismiss."). When courts deviate from this approach, the subjects of the statements or omissions are typically of great importance to the company. *See, e.g.*, *Silverman*, 2008 WL 4360648, at *14 (defendants presumed to know about "production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company"); *Sears, Roebuck*, 291 F. Supp. 2d at 727 (presuming that officers knew about matters "critical to a business's core operations or to an important transaction that would affect a company's performance"); *Desai*, 654 F. Supp. 2d at 841 ("matter of corporate survival").

The court need not decide whether in the abstract it would be reasonable to infer that Pinnacle's executives would have known about margin-eroding pricing promotions or an overall decline in Pinnacle's margins. It is enough to observe that the allegations do not implicate any major or discrete event in Pinnacle's business. Instead, they center around the choice to implement several (unidentified) promotions, allegedly in order to overstate present sales figures, and to pursue business practices that collectively amounted to chasing "volume over value." As discussed, these claims are not pled with adequate specificity, so the court will not opine on whether they could add up to the type of major event or core aspect of Pinnacle's business that Pinnacle's own executives must have known about. And since this is a case against Conagra and its executives, not Pinnacle, any inference of scienter would be more attenuated still.

In further support of their scienter argument, Plaintiffs argue that Connolly had a special familiarity with Pinnacle. In 2014, while CEO of Hillshire, Connolly attempted to acquire Pinnacle. [68] ¶ 124. Moreover, in the years preceding the merger, Connolly engaged with Pinnacle about a potential acquisition several times. [68] ¶¶ 136–39. Here too, Plaintiffs fail to connect the dots. For one, the allegations about channel stuffing and promotions mostly center around Pinnacle's actions in the months before the deal went through. Plaintiffs do not explain what Connolly could have learned in 2014, 2016, or early 2017 that could have alerted him to facts that made his subsequent statements false or misleading. To the extent Plaintiffs are simply arguing that Pinnacle had the same overall "bad habits" that Connolly broke at Conagra, [68] ¶¶ 5, 9, and for that reason Connolly would have recognized those habits in Pinnacle, these allegations are far too general. Plaintiffs do not provide details about any aspect of Pinnacle's business practices during those earlier years, let alone particularized facts about Connolly's investigations that could show Connolly would have been aware of those practices.

Plaintiffs rely on *Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012). There, the court found that it was possible to draw a reasonable inference that since "McCullough was hired for the express purpose of, among other things, fixing CEC's compliance problems regarding its placement reporting," he "made it his business to look into CEC's reporting practices, determine what constituted proper reporting, and bring the company into compliance." *Id.* at *10. No such inference is possible here. Without more information about Pinnacle's business and Connolly's investigations and access to information at any point in time, such an inference here would be wholly speculative. Moreover, unlike in *Ross*, Connolly was never specifically tasked with investigating any issue related to channel stuffing, low-ROI promotions, or the like.

Plaintiffs' scienter allegations suffer from an embedded problem as well. Even if Defendants knew about a Pinnacle promotion or practice, it does not necessarily follow that Defendants knew those promotions or practices were fraudulent or wrongful. As the Seventh Circuit observed in *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), "there is a big difference between knowing about the reports from [a subsidiary] and knowing that the reports are false." *Id.* at 758; *see also Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17-cv-01713, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018) ("[E]ven assuming each individual defendant here was aware of Caterpillar's tax position regarding CSARL, it does not necessarily follow that they disbelieved their statements or sought to deceive investors with their statements.").

First, as to channel stuffing, Plaintiffs have not pled any facts suggesting Defendants *did* uncover facts that led them to believe that Pinnacle engaged in fraud. The court cannot simply assume that Defendants held such a belief because they reviewed sales reports and promotional documents.

Next, to the extent Plaintiffs rely on Pinnacle's promotions and practices irrespective of whether they constituted fraudulent channel stuffing, Plaintiffs must still allege why Defendants would have interpreted those promotions and practices in a way that supports scienter. Plaintiffs allege that "Defendants were aware that once special promotional programs expired, Pinnacle distribution and sales would decline during the second half of 2018." [68] ¶ 129. Asserting that Defendants had the requisite state of mind is not enough; Plaintiffs must state "with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs allege nothing about what Defendants knew about the promotional programs that would lead Defendants to believe that distribution and sales would decline when the promotional programs ended.

Plaintiffs also allege that between August and November 2018, "Pinnacle advertising and promotional expenditures declined by a dramatic 19%." [68] ¶ 131. The complaint continues: "Defendants understood that this drop in promotional

spending would be accompanied by a corresponding sales decline as some existing incentives to customers were no longer being offered." [68] ¶ 131. This allegation is particularly perplexing, since the merger occurred in October and the allegation spans a time period both before and after the merger without specifying which portion of the decline in advertising and promotional expenditures occurred before or after the merger. Assuming some portion of the decline in expenditures happened before the merger, Plaintiffs still provide no facts suggesting that Defendants had information about such a decline at the time of any challenged statement, most of which occurred by August 2018.

Plaintiffs also seem to argue that because the "Conagra playbook" was at odds with the "volume over value" approach of the promotions, the promotions' flaws would have been obvious. But Defendants could have known about the existence of promotions without the benefit of additional information or context that might have led them to later discontinue the promotions. Furthermore, the poor return on investment might have become clear only with the passage of time between the challenged statements and Conagra's eventual discontinuing of the promotions. The possibilities are myriad, and the allegations of the complaint do not give rise to a strong inference that Defendants knew enough to at least make their statements reckless.

### 2. Post-Merger Statements

Plaintiffs also allege that Connolly and Marberger made post-merger admissions about their knowledge at the time of the deal, supporting scienter.

First, Plaintiffs allege that after the merger, Defendants "admitted that they were aware at the time of the deal of supply chain issues and lost distribution for Wish-Bone and SKU proliferation for Duncan Hines." [68] ¶ 130. But Plaintiffs have not plausibly alleged how these issues alone would have rendered any statements false or misleading.

Plaintiffs also argue that the two-month interval between the merger and Defendants' December 20, 2018 post-merger statements disclosing Pinnacle's problems provides additional support for an inference of scienter. Courts frequently reject this type of inference. *See, e.g.*, *Garden City*, 2012 WL 1068761, at *12 (noting that "[p]ost-class period statements" do "nothing to suggest" scienter regarding earlier statements); *Sutton v. Bernard*, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001) ("statements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading"). Without more, this is impermissible "fraud by hindsight." *Higginbotham*, 495 F.3d at 759.

The cases Plaintiffs cite on this point do not hold otherwise. *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824 (S.D.N.Y. 2017), concerned the late timing of the challenged statements, not later statements disclosing bad news.

Moreover, the court explained that one statement's timing was "not alone sufficient to support an inference of scienter," but that in conjunction with other allegations and statements from former employees about internal events during that timeframe, the timing contributed to an inference of scienter. *Id.* at 834 n.6. Likewise, in *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009), the court observed that the "temporal proximity of [an executive's] denials to the end of the quarter" strengthened an inference of scienter considering aspects of that quarter's results that would have led the executive to inquire into the relevant issues. *Id.* at 271.

In this case, Plaintiffs rely on the timing of the post-merger (not pre-merger) statements but do not connect those statements to other events in the timeline in a way that could support an inference of scienter. To the contrary, the timing of the post-merger statements—two months after the merger—is consistent with the opposing inference: that Defendants first learned of Pinnacle's issues after the merger. As to the proximity between the challenged statements and the post-merger statements, there is an obvious and major event in between that confounds any "must have known earlier" inference: the merger. And while the complaint cites a report by an analyst who could not recall a "CEO so deeply criticizing the decisions made within a business acquired only two months prior," [68] ¶ 160(b), the speed and magnitude of Connolly's shift in position after the merger is not enough to suggest knowledge before the merger. These allegations do not support an inference of scienter that is both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314.

### 3. Motive

The parties also dispute whether any facts in the complaint show that Defendants had a motive to make false or misleading statements about Pinnacle's performance. While "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference," the "absence of a motive allegation is not fatal." *Tellabs II*, 551 U.S. at 325. Plaintiffs argue Defendants were motivated to get the deal done and to satisfy JANA, a major investor. Defendants dispute these motives and argue that Defendants stood to lose money since they bought Conagra stock at allegedly inflated prices.

### a. Closing the Deal

To start, allegations that Defendants were motivated by a general desire to ensure the deal went through are not enough. "[A] generalized motive common to all corporate executives is not enough to establish scienter." *Kohl's*, 895 F.3d at 939–40. Motives such as increasing a company's value, "meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation. Were courts to accept these motives as sufficient to establish scienter, most corporate executives would be subject to

such allegations, and the heightened pleading requirements for these claims would be meaningless." *Davis*, 385 F. Supp. 2d at 714; *see also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (incentives to act "in order to keep their jobs, improve their bonuses, and increase the value of their stock options" were too generic to support a strong inference of scienter).

Moreover, Plaintiffs do not explain why bad news about Pinnacle would have stopped the deal. Defendants argue that only Pinnacle's shareholders needed to approve the deal, and disclosure of information suggesting problems with Pinnacle's performance would make an acquisition more attractive for Pinnacle's shareholders.

### b.    JANA

Next, Plaintiffs allege that JANA, one of Conagra's investors, provided a motive for the alleged securities fraud. JANA announced a 7.2% stake in Conagra in June 2015. [68] ¶ 146. JANA sponsored two directors on Conagra's board and hired a "market distribution expert" to help "increase Conagra's profitability." [68] ¶ 144. JANA and Conagra entered into a "standstill agreement" regarding Conagra's brand strategy. [68] ¶ 144. Then, on April 19, 2018 JANA announced a 9.5% stake in Pinnacle, and expressed its interest in Pinnacle's sale. [68] ¶¶ 11, 140. JANA retained a consultant on Pinnacle's operations and "signaled that it would insist on Pinnacle directorships at the next Pinnacle annual meeting if Pinnacle was not sold before then." [68] ¶ 140.

Plaintiffs' theory of how JANA provides a motive goes like this: "In essence, JANA exerted significant influence over Conagra, so Defendants hid the truth about Pinnacle in part to protect JANA." [68] ¶ 145. Connolly was "not about to burn Conagra's significant shareholder and partner JANA, who had a 9.5% investment in Pinnacle, by disclosing known bad news about Pinnacle's brands." [68] ¶ 142. In other words, Defendants realized that publicizing negative information about Pinnacle would cause JANA's Pinnacle investment to take a hit.

Defendants attack this theory on multiple fronts. First, they dispute JANA's ability to control Conagra, Connolly or Marberger. They argue that a January 2017 SEC filing revealed that JANA's stake in Conagra had fallen below five percent—a threshold JANA has not crossed since. *See* [77-15] at 3.[16] They also argue that Plaintiffs fail to allege any direct relationship between JANA and either Connolly or Marberger. Plaintiffs do not dispute these points or argue that JANA could be

---

[16] Plaintiffs do not contest the authenticity of this SEC filing, so the court takes judicial notice of it. *See Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-cv-05641, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011) ("[J]udicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute.")

considered a controlling shareholder of Conagra. *See, e.g.*, *In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (27.7% stake not controlling). Instead, they allege that Connolly and Marberger wished to appease a minority shareholder who exerted some degree of influence over Conagra and sponsored other members of Conagra's board.

Defendants also point to facts that undermine the logic of this motive. For one, JANA bought $200 million worth of Conagra shares in the SPO. *See* [68] ¶ 150. On Plaintiffs' theory, Defendants withheld negative information about Pinnacle for JANA's benefit. Yet selling JANA $200 million worth of Conagra stock at inflated prices would be a strange way of helping JANA. Additionally, Defendants argue that "roughly 1/3 of the merger consideration" that Pinnacle shareholders such as JANA received was Conagra stock. *See* [77-1] at 23 (each Pinnacle share converted to "(i) $43.11 in cash and (ii) 0.6494 shares of Conagra common stock"). That means a substantial portion of what JANA received was stock that lost value when Pinnacle underperformed.

Plaintiffs argue that JANA's purchase in the SPO "facilitated monetization" of its "much larger" stake in Pinnacle, which was worth $600 million. [80] at 42; [68] ¶¶ 148–149. Plaintiffs allege that JANA realized a profit of around $120 million on its Pinnacle investment. [68] ¶ 149. Defendants respond that since Pinnacle's shares were publicly traded, JANA did not need Conagra to acquire Pinnacle in order to cash out. And JANA did not need to buy any shares of Conagra in the SPO to facilitate the deal: the SPO was a "firm commitment underwriting," so the underwriters had agreed to buy all the offered shares. *See* [84-1] at 4 ("[E]ach of the underwriters named below has severally agreed to purchase from us the aggregate number of shares of common stock set forth opposite their respective names below . . .").

On these facts, the allegations about JANA do not give rise to a strong inference of scienter. At best, Plaintiffs have alleged that if Defendants learned negative information about Pinnacle during diligence, the thought might also have occurred that revealing the information would hurt JANA. This highly speculative source of possible motive cannot substitute for particularized facts. Neither Defendants' nor JANA's actions suggest that Defendants knew about Pinnacle's channel stuffing, promotions, or bad habits. Allegedly, JANA used what influence it had over both Conagra and Pinnacle to facilitate the merger. But this is consistent with an inference that JANA and Defendants thought the deal made financial sense for both companies. In addition, JANA's SPO purchase cuts against scienter. If Defendants wanted to protect JANA from bad investments, they would not have sold JANA Conagra stock at inflated prices.

44

### c.    Stock Purchases

As to the potential for personal financial gain, Defendants point out that Connolly and Marberger bought Conagra stock in the SPO: $500,000 and $100,000, respectively.  *See* [77-7] at 15; [77-8] at 2–3.  On the other hand, Plaintiffs do not allege that Connolly or Marberger *sold* Conagra stock during the class period.  Where allegations supporting an inference of scienter are scant, "[p]erhaps suspicious stock sales could tip the balance."  *Kohl's*, 895 F.3d at 940.  Here, the facts tip in the other direction, since Connolly and Marberger bought, rather than sold stock at the allegedly inflated prices.  These facts weigh against the possibility of a strong inference of scienter.  *See Pugh*, 521 F.3d at 695 (fact that defendants were "not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money"); *Harley-Davidson*, 660 F. Supp. 2d at 1001 (fact that defendant "actually increased personal holdings during the class period" weighed against scienter).

Plaintiffs argue that a lack of stock sales is not dispositive.  *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter.").  But where, as here, the allegations do not support a strong inference of scienter, a lack of stock sales can help seal the deal.  *See Tellabs II*, 551 U.S. at 325 ("[T]he significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.").  Over and above a lack of sales, Defendants' additional purchases in the SPO support the "opposing inference, that is, the inference of lack of scienter."  *Tellabs III*, 513 F.3d at 705.

In sum, Plaintiffs have not stated particular facts giving rise to a strong inference of scienter as required by the PLSRA.  *See* 15 U.S.C. § 78u-4(b)(2).  The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs II*, 551 U.S. at 323.  Looking collectively at all the facts discussed above, an inference of scienter would be neither "cogent," nor as "cogent as the opposing inference."  *Tellabs III*, 513 F.3d at 705.  Plaintiffs do not plead particular facts about the diligence process that show Defendants were aware of channel stuffing or any other Pinnacle promotion or practice that made their statements false or misleading at the time of the statement.  In the context of pre-merger diligence, no inference of scienter is possible based on Defendants' positions within the company alone.  Nor do any other facts add up to a strong inference: none of the Defendants' post-merger statements or the actions by JANA cut clearly in favor of scienter, and Defendants' own stock purchases bolster the opposing inference.  The lack of adequate allegations of scienter provides an independent basis for dismissing the Exchange Act claim.

### 4. Knowledge Safe Harbor

The absence of adequate allegations of scienter has another implication as well. The second prong of the PSLRA's safe harbor requires "actual knowledge" of a forward-looking statement's false or misleading nature. *See* 15 U.S.C. §§ 78u-5(c)(1); 77z-2(c)(1). As to Defendants' forward-looking statements the court identified earlier in this opinion, even recklessness is not enough to create liability. Since Plaintiffs have not adequately alleged either recklessness or actual knowledge for any challenged statement, the actual knowledge requirement of the safe harbor does not affect the outcome on the Exchange Act claim. However, the safe harbor applies to both the Exchange Act and the Securities Act. As a result, "a claim under the Securities Act involving forward-looking statements now appears to require, for all practical purposes, proof of scienter." *Newell*, 2000 WL 1705279, at *10.

To recap then: the lack of adequate allegations of scienter bars the Exchange Act claim, and it bars the Securities Act claims to the extent the Securities Act claims rely on Defendants' forward-looking statements.

### F. Securities Act Standing

Defendants also argue that Plaintiffs have not alleged facts sufficient to support standing to bring their Securities Act claims. Since Defendants do not contest Article III standing and argue only that Plaintiffs do not satisfy the requirements of the Securities Act, this issue is properly raised under Rule 12(b)(6) rather than Rule 12(b)(1). *See In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 756 n.7 (1st Cir. 2016); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013); *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, No. 04-cv-07644, 2006 WL 2787520, at *4 (N.D. Ill. Sept. 22, 2006) ("Whether [plaintiff] falls within the class of persons entitled to sue under that section is a different, and non-jurisdictional, question.").

As noted, Plaintiffs advance primary liability claims under both Section 11 and Section 12(a)(2) of the Securities Act, both of which arise out of Conagra's SPO to raise funds before the merger. *See* [68] ¶¶ 194, 203. The parties agree that the standing requirements for those provisions diverge, so the court addresses each provision in turn.

### 1. Section 11

Section 11 creates a cause of action for "any person acquiring" a security for which the registration statement was materially false or misleading. 15 U.S.C. § 77k(a). That means that while a purchase directly in the offering is not required, a purchase of stock that was originally issued in the SPO is. In other words, if Plaintiffs purchased shares "in the aftermarket," they must be able to "trace their

shares back to" the SPO. *Century Aluminum*, 729 F.3d at 1106; *SIRVA*, 2006 WL 2787520, at *4 (citing cases).

In a case where all a company's stock was issued in a single offering, that would be easy to allege. *Century Aluminum*, 729 F.3d at 1106. But where, as here, the challenged statements are connected to a discrete offering of stock and the company previously issued stock in other offerings, this requirement is harder to satisfy. *See id.*; *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016) ("This 'statutory standing' inquiry becomes more complicated where, as here, the company has issued shares under multiple registration statements.") (footnote omitted). Plaintiffs allege: "On or about October 10, 2018, Defendants sold 16.3 million shares of Conagra common stock pursuant to the Offering Documents . . . ." [68] ¶ 15. Before the SPO, Conagra issued 390 million shares in other offerings, and those shares were trading publicly.[17] Thus, the SPO accounted for a relatively small proportion of outstanding Conagra stock (about 4%).

Plaintiffs allege the following about their stock purchases: The SPO price was $35.25. [68] ¶ 23. Lead plaintiff National Elevator Industry Pension Fund "purchased Conagra's common stock at artificially inflated prices during the Class Period and was damaged as a result of Defendants' alleged misconduct." [68] ¶ 33. Plaintiffs City of Taylor Police and Fire Retirement System and City of Sarasota Police Officers' Pension Plan (the "City plaintiffs") "purchased shares in the SPO." [68] ¶¶ 34, 35. Later in the complaint, Plaintiffs allege that the City plaintiffs "acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO," [68] ¶ 198, *see also* [68] ¶ 205, which Defendants note is a potentially less precise claim than purchases "in the SPO."

All three City plaintiffs attach and incorporate certifications that include a schedule of transactions listing the date, number of shares, and price for their Conagra stock purchases. *See* [30-2], [68] at 59, 63. On October 10, 2018, the SPO date, the City of Taylor Police and Fire Retirement System bought 19 shares for $35.25, and 719 shares for $35.77. [68] at 61. The City of Sarasota Police Officers' Pension Plan bought 1,472 shares for $35.25. [68] at 64. Thus, the certifications include Conagra stock purchases by both City plaintiffs on the day of the SPO and at the SPO price, $35.25 per share. *See* [68] at 61, 64. National Elevator did not make any purchases on the SPO date or at the SPO price. [30-2] at 4.

---

[17] Plaintiffs do not allege the number of previously issued shares in the complaint. Defendants, however, attach a Conagra Form 10-K that notes: "At June 24, 2018, 390,888,172 common shares were outstanding." [77-16] at 2. Plaintiffs do not contest this fact and it is not subject to reasonable dispute. Therefore, the court takes judicial notice of the number of outstanding shares. *See Century Aluminum*, 729 F.3d at 1110 ("The district court properly took judicial notice of this document and plaintiffs did not contest its accuracy with respect to the number of shares outstanding at the time of the secondary offering.").

Defendants argue that these allegations are not enough to plausibly allege statutory standing under *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. They argue that considering the total volume of Conagra shares on the market, purchases on the day of the SPO at the SPO price are not enough to plausibly suggest that the City plaintiffs bought shares that were issued in the SPO. Instead, the City plaintiffs most likely bought previously issued shares on the open market.

Plaintiffs contend that instead of "weighing percentages and probabilities of how shares were acquired," the court should accept the complaint's pleaded facts as true. [80] at 60. That is true as far as it goes, but allegations that plaintiffs "acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO," [68] ¶¶ 198, 205, are "conclusory," and "devoid of factual content." *Century Aluminum*, 729 F.3d at 1108.

The two circuits to address the issue have concluded that in a case where shares have been issued in different offerings, "general allegations of traceability, without more," are insufficient. *Ariad*, 842 F.3d at 756; *Century Aluminum*, 729 F.3d at 1108. The court is persuaded by this approach, since "traceability is an element of a Section 11 claim. . . . [A]lmost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element." *Ariad*, 842 F.3d at 756 (quoting *Twombly*, 550 U.S. at 555) (other citations omitted); *see also Century Aluminum*, 729 F.3d at 1107–08 ("[E]xperience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will not be able to trace their shares back to a particular offering. Thus, in this case, plaintiffs had to allege facts from which we can reasonably infer that their situation is different."); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 901 (4th Cir. 2014) (addressing a Section 12 claim and holding that "pursuant and/or traceable to" language in the complaint was "conclusory").

Plaintiffs cite cases where generalized allegations were enough to withstand a motion to dismiss. *See, e.g.*, *In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1194 (N.D. Ill. 2009) ("The amended complaint clearly alleges that Mirsky purchased shares of Ulta in the IPO. That is all that is required."). But none of those cases confronted the "mixed-market" scenario in this case—where alleged misstatements were connected to an SPO but not previous offerings—under the pleading requirements of *Twombly* and *Iqbal*.[18] With respect

---

[18] Plaintiffs cite *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, No. 04-cv-07644, 2006 WL 2787520, at *4 (N.D. Ill. Sept. 22, 2006) ("Plaintiff has alleged that it purchased SIRVA stock 'issued pursuant or traceable to the November 25, 2003 IPO and/or June 10, 2004 SPO.' . . . At this stage of the proceedings, that allegation is sufficient to put plaintiff in the class of investors covered by section 11.") (citations omitted), but in that case there were

to that scenario, the court finds *Century Aluminum* and *Ariad* persuasive. *See Doherty v. Pivotal Software, Inc.*, No. 19-cv-03589, 2019 WL 5864581, at *8 (N.D. Cal. Nov. 8, 2019) (applying *Century Aluminum*, and noting that greater "factual specificity" is required to "adequately allege that shares are traceable to an offering" in a "mixed-market" context).

Accepting the well-pleaded facts of the complaint as true and disregarding conclusory allegations of traceability, the remaining allegation is that the City plaintiffs purchased Conagra stock on the offering date at the offering price. [68] at 61, 64. The question then is whether this is enough to plausibly suggest the City plaintiffs purchased stock traceable to the SPO.

In *Century Aluminum*, the plaintiffs conceded that they "did not buy their shares directly from the underwriters" and did not buy shares "at the offering price of $4.50 per share." 729 F.3d at 1106. Instead, they relied on a "sharp spike in trading volume" on the dates of their trades, which they attributed to a "flood" of new shares hitting the market. *Id.* at 1108. The court held that these allegations did not plausibly support statutory standing, since they did not "tend to exclude the possibility that their shares came from the pool of previously issued shares." *Id.* In *Ariad*, the court held that where "15.3 million shares were issued in connection with the January 2013 offering, but an additional 166 million were already outstanding at that time," and "only one of the named plaintiffs bought on the day of the offering and none of them paid the offering price," the complaint did not give rise to a "plausible inference that the plaintiffs' shares were issued as part of the January 2013 offering." 842 F.3d at 756.

This case is different in at least two ways. First, in both *Century Aluminum* and *Ariad*, the complaint expressly excluded the possibility of a purchase directly from the underwriters. Here, the complaint alleges that the City plaintiffs "purchased shares in the SPO." [68] ¶¶ 34, 35. In *Ariad*, the court indicated that the plaintiffs could have satisfied the pleading requirements "by pleading that they purchased their shares directly in the secondary offering itself." 842 F.3d at 756 (internal quotations omitted). But taking the allegations in the complaint collectively, the court cannot plausibly infer that the defendants made direct purchases from underwriters in the SPO. For one, Plaintiffs do not explain why they also allege more generally that the City plaintiffs "acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO." [68] ¶¶ 198, 205.[19] In *Yates*, the Fourth Circuit described that language as a "coy choice of

alleged misstatements associated with both an IPO and an SPO. Accordingly, *SIRVA* did not present the mixed-market scenario at issue here.

[19] At oral argument, Plaintiffs continued to rely on the more general allegation that the City plaintiffs "acquired Conagra shares pursuant and/or traceable to the Offering Documents for the SPO." *See* [120] at 62, 113. They also argued that discovering who the

words" with respect to who sold the shares. 744 F.3d at 900. Moreover, Plaintiffs do not include allegations about the identity of the seller in these purchases. Plaintiffs are in the best position to know whether the City plaintiffs purchased stock directly from an underwriter and could have included more information in the complaint. *See Ong ex rel. Ong v. Sears, Roebuck & Co.*, No. 03-cv-04142, 2005 WL 2284285, at *14 (N.D. Ill. Sept. 14, 2005) ("Plaintiffs surely do not need discovery to determine whether that purchase was from an initial public offering or the secondary market.").

Second, the plaintiffs in *Century Aluminum* and *Ariad* did not purchase any shares at the offering price. Here, both City plaintiffs did. Defendants argue that the reasoning in those cases still applies: Purchases on the SPO date at the SPO price could have been purchases of previously issued shares. Plaintiffs do not contest that shares of Conagra were publicly traded at the SPO price on the SPO date. *See* [76] at 59 n.22. If the City plaintiffs purchased shares on the open market rather than directly from the underwriters, their shares may or may not have originated in the SPO. *See Krim v. PcOrder.com, Inc*, 402 F.3d 489, 495–96 (5th Cir. 2005) (noting that "market realities" and "the fungibility of stock . . . may render Section 11 ineffective as a practical matter in some aftermarket scenarios"). Given that the SPO accounted for only around 4% of the total outstanding Conagra stock, Defendants argue they more likely did not. The court agrees. While the *Century Aluminum* and *Ariad* courts found that different prices weighed against statutory standing, nothing in those cases suggested purchase price was dispositive. In the context of this case, a purchase at the SPO price is not a fact that tends to exclude the scenario in which Plaintiffs lack standing. *See Century Aluminum*, 729 F.3d at 1108; *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016) (allegations that the plaintiffs "purchased their shares on the day of the 2/13 Offering . . . and for the same offering price" insufficient to support statutory standing for Section 11 and 12(a)(2) claims).

Finally, the *Century Aluminum* and *Ariad* courts found the volume of previously issued stock significant, and the stock issued in the SPO in this case formed an even smaller percentage of the total than in either of those cases. *See also TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 761 (E.D.N.C. 2017) (no "plausible inference" of traceability where "roughly 92% of the shares available for purchase by the public were not issued" in the relevant offering).

All told, Plaintiffs have not plausibly alleged that the named plaintiffs have statutory standing to pursue their Section 11 claim.

---

City plaintiffs bought the shares from would require consulting those parties' investment managers, [120] at 113–15, suggesting that Plaintiffs lack a basis to claim they bought shares "in" the IPO in the sense that they bought shares directly from the underwriters.

## 2.     Section 12(a)(2)

The Section 12(a)(2) claim has the same problem.  Under Section 12(a)(2), any person who "offers or sells a security . . . by means of a prospectus or oral communication" containing a materially false statement or material omission "shall be liable . . . *to the person purchasing such security from him* . . . ." 15 U.S.C. § 77l(a)(2) (emphasis added).  In *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995), "the Supreme Court interpreted the prospectus requirement of § 12(a)(2), and concluded that, because 'prospectus' is a term of art referring to a specific document in a public offering, sales made pursuant to private contracts are not made by means of a prospectus." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 899 (4th Cir. 2014) (quoting *Gustafson*, 513 U.S. at 580–84).  "Thus, § 12(a)(2) liability is 'limited to public offerings,' and purchasers in the secondary market may not sue." *Yates*, 744 F.3d at 899 (quoting *Gustafson*, 513 U.S. at 578).  Statutory standing under Section 12 is even more limited than under Section 11.  A purchase in the secondary market "traceable" to the offering in question is not enough; only a purchase made *in* a public offering works.

As discussed above, Plaintiffs' allegations that the City plaintiffs "purchased shares in the SPO," [68] ¶¶ 34, 35, are insufficient to plausibly plead that the City plaintiffs purchased shares directly from the underwriters.  Accordingly, the allegations do not adequately plead statutory standing for the Section 12 claim either.  *See Yates*, 744 F.3d at 899; *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, at *13 (N.D. Ill. Sept. 14, 2005); *cf. Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18-cv-06175, 2020 WL 60186, at *14 (N.D. Ill. Jan. 6, 2020) ("These allegations show that both the Plaintiffs and members of the Class purchased Tribune stock in the Oaktree Offering from Morgan Stanley and that Morgan Stanley solicited such purchase, which is sufficient to give the Plaintiffs standing under Section 12(a)(2).").

Finally, Plaintiffs argue that even if the named plaintiffs do not have individual standing, they are entitled to produce at class certification additional plaintiffs who do have individual standing.  That argument is not consistent with Seventh Circuit precedent.  *See Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share.  Standing cannot be acquired through the back door of a class action."); *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, No. 04-cv-07644, 2006 WL 2787520, at *12 (N.D. Ill. Sept. 22, 2006) ("[T]here must be [at] least one named plaintiff who does have standing to sue as to every claim."); *Ong ex rel. Ong IRA v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004); *but see In re Groupon, Inc. Sec. Litig.*, No. 12-cv-02450, 2013 WL 12284524, at *2 (N.D. Ill. Sept. 18, 2013) (while the lead plaintiff admitted "he did not purchase shares directly from the IPO," standing could be resolved "at the class certification stage, when another plaintiff with standing will be proffered") (citing *Friedman v. Rayovac*

*Corp.*, 295 F. Supp. 2d 957, 976-977 (W.D. Wis. 2003)). Plaintiffs may not defer dismissal by promising to satisfy the statute's requirements later.

The complaint does not adequately plead statutory standing as to either Section 11 or Section 12(a)(2) of the Securities Act. For this reason, as well as the others identified in this opinion, those claims are dismissed.

## II.   Control Liability

Having dismissed the primary liability claims under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act, the court dismisses the secondary claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act as well. These claims allege control person liability on the part of Connolly and Marberger (for both secondary claims) and a number of other "director defendants" (for the Section 15 claim), by virtue of their positions. *See* [68] ¶¶ 41–51 187, 208, 211.

Under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a): "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." To state a claim under this provision, Plaintiffs must allege "(1) a primary violation of securities law; (2) that each individual defendant exercised general control over the primary violator's operations; and (3) that each individual defendant 'possessed the power or ability to control the specific transaction or activity [upon] which the primary violation was predicated, whether or not that power was exercised.'" *Societe Generale*, 2018 WL 4616356, at *8 (citation omitted); *see also Pugh*, 521 F.3d at 693 ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5."). As discussed above, Plaintiffs have not adequately alleged a primary violation of securities law. Necessarily, the claim for control person liability under Section 20(a) fails as well.

The same is true of the claim under Section 15 of the Securities Act, 15 U.S.C. § 77o(a) ("Every person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such person is liable . . . ."). *See Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994) (noting Section 15 of the 1933 Act sets out "'control person' liability— providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another"). Without a claim for primary liability under Sections 11 or 12(a)(2), there can be no control liability claim under Section 15. *See Yates*, 744 F.3d at 901 ("We dismiss the § 15 claim because the complaint fails to state a claim under the predicate Securities Act provisions.").

## Conclusion

For the reasons above, the court grants the motion to dismiss [75] in full. However, the court declines to dismiss with prejudice, as Defendants request. *See Kohl's*, 895 F.3d at 941 ("We repeatedly have said that a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. . . . This admonition carries special weight in securities fraud cases because in this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.") (internal quotation marks, brackets, and citations omitted). The consolidated class action complaint is dismissed without prejudice. If Plaintiffs can file an amended complaint consistent this opinion, they may do so by December 10, 2020.

Date: October 15, 2020          <u>/s/ Martha M. Pacold</u>